**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CLEM D. DALRYMPLE** | * | **CASE NO. 18-14237** |
| **vs.** | * | **SECT. R(2)** |
| **UNITED STATES OF AMERICA** | * | **JUDGE VANCE** |
| | * | **MAG. JUDGE CURRAULT** |

## UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**NOW INTO COURT,** through the undersigned Assistant United States Attorneys, comes defendant, the United States of America, and submits the following proposed findings of fact and conclusions of law for the Court's consideration and adoption under Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

### I. The accident.

1. On January 15, 2017, Plaintiff was operating a 1979 Harley Davidson motorcycle owned by Daniel Bordelon on Highway 22 in Tangipahoa Parish, Louisiana. (Stipulation #1).
2. The speed limit on the portion of Highway 22 on which Plaintiff was traveling is 55 miles per hour. (Stipulation #2).
3. At approximately 5:10 p.m. on January 15, 2017, Jonathan Jones, a Rural Carrier Associate of the United States Postal Service, was operating a 1993 GM Postal Service Long Life Vehicle (LLV) and had completed delivery of a package at 12152 LA-22, Ponchatoula, Louisiana. (Stipulation #3).
4. On January 15, 2017, Jones began to exit the private driveway and turn left onto Highway 22 when the LLV was struck by the 1979 Harley Davidson. (Ex. 34 bates labeled USPS7).

5. Specifications for Jones' vehicle indicate that Jones made a left turn and not a U-turn, as the vehicle has a minimum turning radius of approximately seventeen feet. (Ex. 51 bates labeled USPS209, Winkler testimony 22:20-23:20 and 26:7-29:15, and Ex. 3 and 4 to Winkler testimony).
6. The motorcycle being operated by Mr. Dalrymple was of such an age that it did not have an "automatic headlight switch" that would turn the headlight on, whenever the motorcycle was being operated. (Ex. 51 bates labeled USPS209 and Winkler testimony 33:18-34:4).
7. The motorcycle's manual indicated that headlamp operation was controlled manually by the operator with an on/off switch. (Ex. 51 bates labeled USPS209 and Winkler testimony 33:18-34:4).
8. Research and guidance has shown that during the day, a motorcycle with its light on is twice as likely to be noticed. (Ex. 51 bates labeled USPS210 and Winkler testimony 34:14-36:2).
9. Jones as well as the witness Ronald Bryant both testified that they did not see the motorcycle before the crash. (Ex. 51 bates labeled USPS208, Winkler testimony at 29:17-30:13, Jones testimony 26:1-2 and Bryant testimony 36:10-12).
10. The motorcycle's headlamp was off before the crash occurred on January 15, 2017. (Winkler testimony 30:14-22).
11. Jones was acting in the course and scope of his employment with the USPS at the time of the accident. (Stipulation #4).
12. Trooper Jerome Brignac from the Louisiana State Police Troop L investigated the accident. After his investigation, he issued a ticket to Jones for failing to yield. (Stipulation #5).

13. Jones complained of possible injury and was ultimately taken from the scene to North Oaks Hospital in Hammond, LA. (Jones testimony 31:6-11).
14. Plaintiff was airlifted by Acadian Ambulance Service from the scene to North Oaks Hospital. (Stipulation #6).
15. On January 15, 2017, Plaintiff underwent a urinalysis, and tested positive for THC and opiates. (Ex. 43 bates labeled USPS73 and Watson testimony 55:8-13).
16. If Plaintiff had been on an opioid or THC at the time of the accident on January 15, 2017, that could have contributed to this accident. If Plaintiff had opioids in his system it could have affected his reaction time and the accident itself. (Watson testimony 55:19-22 and 56:13).
17. Plaintiff was discharged from North Oaks Hospital on January 31, 2017. (Stipulation #7).
18. Plaintiff was not under the care of a primary care physician at the time of the accident. (Stipulation #12).

## II. Plaintiff's prior history.

19. Plaintiff has a prior history of substance abuse including marijuana and opioids that have been found on drug screens. He also has a history of alcohol abuse and previous DUIs due to alcohol issues. All of these issues have been shown to be risk factors for the development of chronic pain, not explained by medical findings. They have also been shown to be risk factors for treatment failure for procedures designed to treat chronic pain. (Ex. 43 bates labeled USPS91-92 and Watson testimony 54:8-55:6).
20. Plaintiff admits that "in the past he has smoked marijuana." (Stipulation #8).
21. Plaintiff has had two DWI convictions. (Ex. 11 at 2).

22. Plaintiff was arrested for DWI in Tangipahoa Parish seven to eight years prior to September 13, 2019 and he was put on probation. (Dalrymple testimony at 16:18-17:15 and 18:1-24).

23. On June 7, 2014, Plaintiff was arrested for DWI after he was taken to North Oaks Hospital for his involvement in a motorcycle crash. (Ex. 43 bates labeled USPS87).

24. On September 22, 2014, Plaintiff tested positive for benzodiazepines, opioids, and marijuana. (Ex. 43 bates labeled USPS87).

25. On March 3, 2015, Plaintiff tested positive for benzodiazepines, THC, and opioids. (Ex. 43 bates labeled as USPS88).

26. As of June 1, 2017, Plaintiff was an everyday smoker of THC. (Ex. 43 bates labeled as USPS80).

27. Plaintiff had a history of gastrointestinal reflux disease or GERD, vomiting, and inflammation of his esophagus or esophagitis that pre-dated this accident. He had also been to the ER for chest pain and left arm pain in the past. (Watson testimony 21:20-22:10).

28. Plaintiff presented to the Emergency Rooms at North Oaks Hospital and Lallie Kemp on ten separate occasions before the accident on January 15, 2017 beginning in 2014 for a history of gastritus and GERD. (Stipulation #13).

29. One physician suggested THC is likely contributing to this chronic condition. (Ex. 43 bates labeled USPS91 and Watson testimony 22:19-22 and 23:4-12).

30. Plaintiff's chronic, ongoing nausea and vomiting is not related to the motorcycle accident due to the significant medical records which pre-date this accident. (Ex. 43 bates labeled USPS91 and Watson testimony 21:20-5 and 23:14-21).

31. This accident did not exacerbate Plaintiff's GERD or reflux issues. (Watson testimony 23:14-21).

## III. Plaintiff's treatment history.

<u>Plaintiff's injuries as a result of the accident</u>

32. Plaintiff sustained an open left wrist fracture, laceration to the left elbow, lacerations to the right hand, nondisplaced right sacral ala fracture, nondisplaced left pubic root fracture, left inferior pubic ramus fracture, and a right wrist fracture as a result of this accident. (Ex. 43 bates labeled as USPS88 and Watson testimony 27:23-28:16).
33. Plaintiff underwent appropriate treatment for his lacerations and fractures, including a left wrist fusion. (Ex. 43 bates labeled as USPS88 and Watson testimony 31:9-32:17).
34. Plaintiff's left wrist fusion was successful. (Watson testimony 33:11-24).
35. Plaintiff's wrist fusion was an outpatient surgery. (Watson testimony 125:17-21).
36. Plaintiff's wrist fusion prevents him from flexing and extending his wrist, but he has full use of his fingers, can make a grip, and can extend his fingers. (Watson testimony 34:3-14).
37. Plaintiff's right wrist and hand have full motion and no restrictions. (Watson testimony 35:2-10).
38. Dr. Kinnett, who performed Plaintiff's wrist surgery, approved Plaintiff to return to normal activities on May 8, 2018. (Watson testimony 126:15-25).
39. Plaintiff was treated non-operatively, or without surgery, for his sacral ala fracture, which healed on its own over two to three months. (Watson testimony 28:17 – 29:18).

40. Plaintiff's pubic fracture was also treated non-operatively and healed within two to three months. (Watson testimony 29:19 – 30:14).
41. Plaintiff's radius and ulna fractures were also treated non-operatively and healed within two to three months. (Watson testimony 30:15 – 31:8).
42. Other than the injury to his left wrist, none of Plaintiff's injuries related to this accident were treated surgically. (Watson testimony 31:15-20).
43. Plaintiff has reached maximum medical improvement for all injuries resulting from this accident. (Ex. 43 bates labeled as USPS88 and Watson testimony 31:21-25).

Alleged Lumbar Injuries

44. There was no CT scan of Plaintiff's lumbar spine done during his stay in the hospital following this accident. (Watson testimony 46:19-23).
45. The CT scan of Plaintiff's abdomen and pelvis done at the hospital following the accident showed degenerative changes to Plaintiff's lumbar spine, but no evidence of any acute injury. (Watson testimony 46:24 – 47:22).
46. The medical records mention back pain in February 2017 following Plaintiff's fall in the hospital, but no diagnosis was given at that time and he did not receive any treatment. (Watson testimony 37:17 – 38:14).
47. Plaintiff first reported back pain on May 22, 2017. (Watson testimony 38:15-25).
48. Presenting with neck or back pain three and a half months after an accident is not consistent with a significant acute injury to the cervical lumbar spine from a motor vehicle accident because these symptoms would present immediately. (Watson testimony 39:5 – 40:8).
49. Plaintiff's other injuries did not "mask" his back injury. (Watson testimony 41:19 – 42:10).

50. On June 1, 2017, Plaintiff was seen for the first time regarding complaints of lower back pain radiating into both legs. (Ex. 43 bates labeled USPS80 and 90 and Watson testimony 38:15-25).

51. The lumbar MRI taken on that day showed multilevel disk desiccation and facet joint arthritis. (Watson testimony 47:23 – 48:20).

52. The lumbar issues seen on this MRI are typical with the wear and tear process of someone Plaintiff's age and are not evidence of any acute changes to the lumbar spine. (Watson testimony 48:21 – 49:16).

53. Plaintiff had a lumbar fusion and implantation of a coflex device in January 2018, but the need for these surgeries was to treat Plaintiff's pre-existing lumbar arthritis and not related to this accident. (Watson testimony 51:9-20).

54. Following these surgeries Plaintiff has nearly full flexion of his lumbar spine. (Watson testimony 51:21 – 52:8).

55. Plaintiff's claimed injuries and medical treatment to his back is not related to this accident, but rather were caused by his pre-existing lumbar arthritis. (Ex. 43 bates labeled as USPS89-90 and Watson testimony 24:9-25:18 and 39:5-22).

56. In 2014 Plaintiff had CT scans of the abdomen and pelvis. These scans show evidence of pre-existing advanced disc space narrowing at L5-S1 with spurs and facet arthritis throughout the lumbar spine. This would denote the significant pre-existing arthritic changes before the accident. (Ex. 43 bates labeled as USPS 90 and Watson testimony 24:9-25:18).

57. Dr. LaFleur did not place Plaintiff on any physical restrictions after the completion of the back surgery. (LaFleur testimony 47:9-25).

58. Plaintiff could lift up to 50 pounds following his back surgery. (LaFleur testimony 48:1-3).

Alleged Cervical Injuries

59. On January 15, 2017 Plaintiff had a CT scan of his cervical spine which showed some mild degenerative disc disease at C3-C4 with some minimal degenerative changes at the other cervical levels. There was no evidence of any acute injury to the cervical spine. (Watson testimony 42:16-43:19).

60. This CT scan did not show any evidence of acute injury to Plaintiff's cervical spine. (Watson testimony 43:2-19).

61. Plaintiff did not receive any treatment for any cervical injuries during his hospital stay following this accident. (Watson testimony 43:20-24).

62. The June 15, 2017 MRI of Plaintiff's cervical spine revealed disk desiccation, facet joint arthritis, and degenerative changes in the cervical spine, which are not related to this accident. (Watson testimony 43:25 – 45:3).

63. Plaintiff never treated or had any surgical procedures done for any cervical issues. (Watson testimony 45:24 – 46:3).

Alleged Brain and/or Head Injuries

64. Plaintiff had a small area of bleeding outside of the brain but inside the skull. Plaintiff's treatment was observation. It was considered a bruise. This bruise was small enough that it wasn't concerning for progression. (Duke testimony 20:25-22:1).

65. Plaintiff did not present any medical testimony from a neurologist therefore there is no competent medical testimony supporting Plaintiff's claim that he suffered any sort of traumatic brain and/or head injury as a result of this accident.

<u>Other Alleged Injuries</u>

66. Plaintiff did not present any medical testimony or evidence from a psychologist or psychiatrist, therefore there is no competent medical evidence in the record supporting any of Plaintiff's claims for hallucinations, PTSD, or any other psychological issues resulting from this accident.
67. There is no evidence on the CT scans or x-rays of any rib fractures as a result of this accident. (Watson testimony 36:20 – 37:6).
68. There is no objective evidence of any right metacarpal fractures as a result of this accident. (Watson testimony 37:7-16).
69. Plaintiff was diagnosed with a nondispalced left radial head fracture (left elbow) after a fall in the hospital on January 22, 2017. (Ex. 43 bates labeled as USPS88 and Watson testimony 35:13-36:19).
70. Plaintiff's left radial head fracture (left elbow) is not a result of the motorcycle accident. (Ex. 43 bates labeled as USPS88 and Watson testimony 35:13-36:19).
71. No doctor has rendered Plaintiff totally and permanently disabled. (Ex. 11, Ducote testimony 45:24-46:7, and Hegwood testimony 34:7-12).

Employment

72. Plaintiff represented to the Social Security Administration (SSA) that he became unable to work due to his disabling condition on December 30, 2013 – four years prior to accident. (Ex. 53 bates labeled SSA0007 and Meyers testimony 42:1-43:7).

73. The SSA found that Plaintiff was disabled on September 1, 2016 - over four months before the accident. (Ex. 53 bates labeled SSA0001 and Meyers testimony 41:15-18).

74. Plaintiff's SSA benefits began February of 2017. (Ex. 53 bates labeled SSA0001 and Meyers testimony at 41:7-14).

75. If any of the information reflected in the SSA benefits documents were inaccurate, Plaintiff had an affirmative duty to correct the mistake within ten days of receiving notice. (Ex. 53 bates labeled SSA0010 and Meyers testimony 40:1-43:25).

76. Plaintiff corrected his name on the SS application. No other corrections were made. (Ex. 53 bates labeled SSA0018 Meyers testimony 40:1-43:25).

77. Plaintiff failed to provide the following documentation relating to his pre-incident earnings: income tax returns, forms W-2/1099, payroll stubs, employment records, and social security earning reports. (Ex. 49 bates labeled USPS185 and Meyers testimony at 31:2-24).

78. At the time of the accident, Plaintiff testified he was working at Tommy's Auto Repair making $300-$400 a week. (Dalrymple testimony 139:4-7).

79. Plaintiff testified he did not report the cash he received from Tommy's Auto Repair on his tax returns. (Dalrymple testimony 147:22-24).

80. Tommy Flocke, the owner of Tommy's Auto Repair, spells his name with an "e" on the end of Flocke. (Meyers testimony 54:2-56:16 and Ex. 6 to Meyers deposition).

81. Plaintiff's economist Craig Silva relied on a March 29, 2018 letter signed by Tommy Flock (not Flocke) and information provided to him by Plaintiff's council to calculate Plaintiff's alleged lost wage claim. (Silva testimony 27:20-28:8).

82. The August 4, 2020 affidavit of Tommy Flocke was signed by Tommy Flocke's wife Suzanne Flocke. The affidavit fails to address whether Mr. Flocke himself signed the March 29, 2018 letter or why his name was misspelled. (Ex. 6 to Meyers deposition).

83. Silva did not verify that Plaintiff actually made $500.00 a week at Tommy's Auto Repair when calculating Plaintiff's alleged lost wages. Silva did not review any other documents from Plaintiff's employers, documents from the IRS, paystubs, W-2s, or W-4s. He also failed to ask for these documents. (Silva testimony at 28:22-31:6).

84. Silva assumed that Plaintiff is totally and permanently disabled as of the date of the incident and unable to return to the workforce. (Ex. 49 bates labeled USPS186 and Meyers testimony 72:2-20).

85. Plaintiff's expert, Ronnie Ducote, testified Plaintiff is able to return to work at the sedentary and light physical demand levels. (Ex. 11 at 6 and Ducote testimony 46:15-24).

86. Plaintiff was on Medicaid at the time of the accident. (Dalrymple testimony 31:15).

87. Plaintiff can return to light work with restrictions. (Ex. 45 bates labeled USPS121, Hegwood testimony 46:20-48:3, P's Ex. 11 at 6, and Ducote testimony 46:15-24).

88. Plaintiff is suitable for alternative types of employment. The alternative types of jobs, their physical demand level, and jobs that are suitable for Plaintiff have median wages that range

from $16.35-$31.59 an hour. (Ex. 45 bates labeled USPS121, Ex. 49 bates labeled USPS185, and Hegwood testimony 48:18-49:12).

89. Plaintiff has demonstrated no lost wages subsequent to this accident and has been able to work subsequent to the incident date at wages commensurate with his pre-incident earnings. (Ex. 49 bates labeled USPS185 and Meyers testimony 85:6-25).

<u>Future medical care</u>

90. Plaintiff is not asserting a claim for future medical costs. (Stipulation #9).

91. Plaintiff's medical bills related to this accident have been paid by Medicaid. There is a Medicaid lien in the amount of $58,082.97. (Stipulation #11).

## CONCLUSIONS OF LAW

**I. General.**

1. This case was filed against the United States under the Federal Tort Claims Act (FTCA).

2. The FTCA constitutes a "limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976); 28 U.S.C. §§ 1346(b) & 2674.

3. Under the FTCA, the United States' liability for tort claims is "in the same manner and to the same extent as a private individual under like circumstances" according to the law of the state where the alleged tortious action occurred. 28 U.S.C. § 2674; *Owen v. United States*, 935 F.2d 734, 737 (5th Cir. 1991).

4. Since the alleged tortious action in this case occurred in Louisiana, Louisiana substantive tort law applies in this case. *Id.*

5. USPS Letter Carrier Jonathan Jones was acting in the scope of his federal employment with USPS at the time of the alleged tortious act in this case.

**II. Liability and damages.**

6. In a negligence action under Louisiana Civil Code Art. 2315, the plaintiff bears the burden of proving fault, causation, and damages. *Wainwright v. Fontenot*, 774 So. 2d 70, 74 (La. 2000). "Damages based on mere speculation or conjecture are not allowed." *LePrettre v. Progressive Land Corp.*, 820 So. 2d 1240, 1247 (La. App. 3 Cir. 2002). "It is well settled that it is the plaintiff's burden to prove with legal certainty every item of damages claimed." *Smith v. White*, 411 So. 2d 731, 735 (La. App. 3 Cir. 1982).

7. Louisiana C.C. art. 2323 requires that the comparative fault of all parties be assessed in tort actions.

> In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

8. In assessing the nature of the conduct of the parties for comparative-fault purposes, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances

which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. *Watson v. State Farm Fire and Cas. Ins. Co.*, 469 So. 2d 967, 974 (La. 1985).

9. “Establishing liability does not relieve plaintiff from proving his damages.” *Moolekamp v. Rubin*, 531 So. 2d 1124, 1127 (La. App. 4 Cir. 1988). “That is, having proven that defendant’s fault caused him some damage, plaintiff must go on to prove what damage, by kind and seriousness, was caused by defendant’s fault before the court can render an appropriate award as compensation.” *Id.*

10. “Although a tortfeasor takes his victim as he finds him, the tortfeasor cannot be held liable for injuries which are not attributable to the wrongful act.” *Coleman v. Lewis*, 757 So. 2d 907, 908 (La. App. 1. Cir. 2000).

11. A Plaintiff with a pre-existing condition allegedly aggravated by a negligent act must establish a causal link between the negligent act and the degree of aggravation to receive compensation. *White v. State Farm Mut. Auto. Ins. Co.*, 713 So. 2d 618, 622 (La. App. 3 Cir. 1998); *Tobin v. Wal-Mart Stores, Inc.*, 575 So. 2d 946, 950 (La. App. 2 Cir. 1991).

12. A tort-feasor is liable only for damages caused by his negligent act. He is not liable for damages caused by a separate, independent or intervening cause. *Broussard v. Razden*, 763 So. 2d 644, 652 (La. App. 1 Cir. 1999).

13. “A judgment awarding no damages is valid where plaintiff fails to prove damages caused by the tortious act of the defendant, even though the defendant is at fault.” *Unique Const. Co., Inc. v. S.S. Mini Storage, Inc.*, 570 So. 2d 161, 164 (La. App. 5 Cir. 1990).

14. In a bench trial, it is the function and province of the district judge, as finder of fact, to assess and weigh witness credibility. *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000); *Garr v. W. Sizzler*, 273 F.3d 1108, at *2 (5th Cir. 2001).

15. As with jurors, the district judge in a bench trial "may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case that he or she may have, and the consistency or inconsistency of his or her testimony considered in the light of the circumstances. Has the witness been contradicted by other credible evidence? Has he or she made statements at other times and places contrary to those made here on the witness stand?" Fifth Cir. Pattern Jury Instruction (Civil) 3.4 (Witnesses); *cf.*, *Hampton Bermuda Ltd. v. M/V STAR SIRANGER*, 2008 WL 1808550, at *4 (S.D. Tex. Apr. 18, 2008) (citing Fifth Circuit pattern jury instructions in civil bench trial).

16. Similarly, with expert witnesses, the district court in a bench trial may consider both the reliability and the credibility of the expert testimony in coming to a final disposition. *See Thuan Vo Tran v. Abdon Callais Offshore, LLC*, 2015 WL 13532508, at *1 (E.D. La. Apr. 13, 2015); *see also* Fifth Cir. Pattern Jury Instruction (Civil) 3.5 (Expert Witnesses) (finder of fact is permitted, but not required, to accept and rely on expert opinions).

17. "In particular, an opinion based on 'insufficient, erroneous information' fails the reliability standard." *Moore v. Int'l. Paint, L.L.C.*, 547 Fed.Appx. 513, 515 (5th Cir. 2013) (quoting *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009). In addition, "expert testimony that relies on 'completely unsubstantiated factual assertions' is inadmissible." *Id.* (quoting *Hathaway v. Bazany*, 507 F.3d 312, 319 n. 4 (5th Cir. 2007)).

18. “When an expert’s testimony is ‘not based upon the facts in the record but on altered facts and speculation designed to bolster [a party’s] position,’ the trial court should exclude it.” *Moore v. Int’l. Paint, L.L.C.*, 547 Fed.Appx. 513, 515 (5th Cir. 2013) (quoting *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996).

19. Based on the Court’s assessment of the evidence and witnesses, Plaintiff has not carried his burden of proving by a preponderance of the evidence the existence of any special or general damages factually and proximately caused by the January 15, 2017 motor vehicle collision.

20. Plaintiff has not established that his injuries were caused by this accident. “That is, having proven that defendant’s fault caused him some damage, plaintiff must go on to prove what damage, by kind and seriousness, was caused by defendant’s fault before the court can render an appropriate award as compensation.” *Moolekamp v. Rubin*, 531 So. 2d 1124, 1127 (La. App. 4 Cir. 1988).

21. “A judgment awarding no damages is valid where plaintiff fails to prove damages caused by the tortious act of the defendant, even though the defendant is at fault.” *Unique Const. Co., Inc. v. S.S. Mini Storage, Inc.*, 570 So.2d 161, 164 (La. App. 5 Cir. 1990).

22. Plaintiff’s treating physician’s testimony should be limited to the facts and opinions contained in their already-produced medical records. *See Perdomo v. United States*, 2012 WL 2138106, at *1 (E.D. La. June 11, 2012) (treating physicians “will not be allowed to testify outside the scope of their medical records.”); *Sheppard v. Liberty Mut. Ins. Co.*, No. CV 16-2401, 2017 WL 467092, at *2 (E.D. La. Feb. 2, 2017)(“the treating physicians are excluded from offering any expert opinion testimony.”); *see also Ballinger v. Casey’s Gen. Store, Inc.*, 2012 WL 1099823 at *5 ((S.D. Ind. Mar. 29, 2012) (limiting testimony of

expert witness to "personal observations, diagnoses, and treatment contained in the medical records and formed in the course of treatment" while excluding causation testimony that was not disclosed.)

**III. Medical causation**

23. A nurse practitioner is not qualified to render opinions on medical causation, and courts in this district have acknowledged that fact. *See* La. R.S. §37:913(13); *see also Shields v. Dolgencorp*, L.L.C. No. 16-1826, 2016 WL 6892889, at *4 (E.D. La. Nov. 23, 2016) (Fallon, J.) ("Plaintiff seeks to prove medical causation not with a medical doctor, but with a nurse practitioner. While this Court acknowledges that a nurse practitioner has more training and licensure than a registered nurse, it is not the same degree as a license to practice medicine. Under La. R.S. 37:913(13), a license to practice nursing does not qualify a nurse to render medical diagnosis or opine on medical causation.")

24. When the conclusion regarding medical causation is not one within common knowledge, expert medical testimony is required to prove causation. *See Pfiffner v. Correa*, 643 So.2d 1228, 1234–35 (La.1994).

25. Under Louisiana jurisprudence, the plaintiff in a personal injury suit bears the burden of proving by a preponderance of the evidence a causal relationship between his or her injury and the accident. The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. *Maranto v. Goodyear Tire & Rubber Co.,* 94–2603 (La.2/20/95), 650 So.2d 757, 759; *Kemp v. Metabolife Int'l, Inc.*, No. 00-3513, 2004 WL 2095618, at *3 (E.D. La. Sept. 13, 2004)

26. The *Housley* presumption does not apply here because Plaintiff did not prove that he was in good health prior to this accident, and the medical testimony provided did not show a reasonable possibility that this accident cause the injuries claimed. *Housely v. Cerise,* 579 So.2d 973, 980 (La. 1991).

27. Plaintiff and any other fact witnesses' testimony is insufficient to legally prove medical causation. *Lassiegne v. Taco Bell Corp.*, 202 F.Supp.2d 512, 523-24 (E.D.La. 2002).

28. The Fifth Circuit has held that the *Daubert* reliability analysis "applies to, among other things, 'the facts underlying the expert's opinion.'" *Moore v. Int'l. Paint, L.L.C.*, 547 Fed.Appx. 513, 515 (5th Cir. 2013) (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).

**V. Lost wages**

29. To receive an award for loss of future earnings or loss of earning capacity, Dalrymple must prove that because of his injuries, he has suffered a loss of income. *LeBlanc v. Allstate Ins. Co.*, 00-1128 (La. App. 5 Cir. 11/28/00); 772 So. 2d 400, 405.

30. A tort-feasor is liable only for damages caused by his negligent act. He is not liable for damages caused by a separate, independent or intervening cause. *Broussard v. Razden*, 763 So. 2d 644, 652 (La. App. 1 Cir. 1999). It is the plaintiff's burden to establish that the injuries sustained were not the result of the intervening act. *Orthopaedic Clinic of Monroe v. Ruhl*, 786 So. 2d 323, 331 (La. App. 2 Cir. 2001); *Guillie v. Comprehensive Addiction Programs, Inc.*, 735 So. 2d 775, 778 (La. App. 4 Cir. 1999).

31. Plaintiff's claim that his pre-accident earning capacity has been diminished by the accident on January 15, 2107 is too speculative and not reasonably supported by the evidence.

32. Plaintiff has not incurred any damages for lost wages or loss of earning capacity.

Respectfully submitted,


*/s/ Mary Katherine Kaufman*
**MARY KATHERINE KAUFMAN**
Assistant United States Attorney
LA Bar Roll No. 32719
**ELIZABETH A. CHICKERING**
Assistant United States Attorney
LA Bar Roll No. 31099
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3008
Facsimile: (5040) 680-3174
Mary.Katherine.Kaufman@usdoj.gov
Elizabeth.Chickering@usdoj.gov