UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CLEM D. DALRYMPLE                                CIVIL ACTION

VERSUS                                                   NO. 18-14237

UNITED STATES POSTAL SERVICE,                SECTION "R" (2)
ET AL.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.   INTRODUCTION

This case arises out of a motorcycle accident.  On January 15, 2017, plaintiff, Clem Dalrymple, struck a United States Postal Service (USPS) truck driven by Jonathan Jones while riding his motorcycle on Highway 22 in Tangipahoa, Louisiana.[1]  Dalrymple asserts that the accident was caused by Jones' negligent failure to yield.[2]

On December 27, 2018, plaintiff filed a lawsuit in this Court.[3]  Citing the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq*. (FTCA), plaintiff seeks to hold the United States of America liable for Jones' alleged negligent failure to yield.[4]

On February 3, 2021, the Court held a bench trial.  After hearing live testimony and reviewing all the evidence presented by both parties, the Court renders its Findings of Facts and Conclusions of Law under Federal Rule of Civil

---

[1]     R. Doc. 1 at 2 ¶¶ III-IV.
[2]     R. Doc. 1 at 2 ¶ V.
[3]     R. Doc. 1 at 7 ¶ XVII.
[4]     R. Doc. 1 at 1 ¶ I.

Procedure 52(a) as set forth below.    To the extent any findings of fact may be construed as conclusions of law, the Court adopts them as such.   To the extent any conclusions of law may be construed as findings of fact, the Court adopts them as such.

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    The Accident

On January 15, 2017, at or around 5:10 p.m., plaintiff Clem Dalrymple was driving a 1979 Harley Davidson motorcycle on Highway 22 in Tangipahoa Parish, Louisiana.[5]  Dalrymple was traveling east.[6]  The speed limit was 55 miles per hour.[7]

       1.    *The USPS Truck Was on the Eastbound Shoulder Before the Accident*

Eyewitness, Ronald Bryant, testified that he was traveling westbound on Highway 22[8] on the date of the accident when he came upon a USPS truck on the eastbound shoulder of the road.[9]   Bryant stated that the USPS truck attempted a U-turn from the shoulder to travel westbound, and that Dalrymple struck the USPS

---

[5]    Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.
[6]    Bryant Transcript at 58:3-10.
[7]    Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.
[8]    Bryant Transcript at 28:10-12.
[9]    Bryant Transcript at 35:20-37:23.

truck as it was in the midst of attempting the U-turn.[10]  Plaintiff's testimony was consistent with Bryant's.[11]

The Government asserts that the USPS truck entered Highway 22 from a private driveway, not from the eastbound shoulder.[12]  In support of its position, the Government provided expert testimony from its accident reconstructionist, Wayne Winkler.  Winkler testified that the USPS truck had a turning radius of seventeen feet.[13]  Winkler also testified that the police photographs taken after the crash indicated that the truck had a "westerly component to its final resting position."[14]  Based on the USPS truck's turning radius and its westerly orientation at final rest, Winkler concluded that the USPS truck entered Highway 22 from a private driveway.[15]  Had the USPS truck U-turned from the eastbound shoulder, Winkler opined, it would have faced "somewhat east" at final rest.[16]

The Court does not find Winkler's testimony persuasive.  Winkler's analysis is dependent upon his "crash reconstruction software,"[17] which he does not explain.  Other than testifying that he used crash reconstruction software, he does not describe anything about it.  He does not explain, for example, how his software is programmed or establish that it would yield correct results.  He offers only the

---

[10]    Bryant Transcript at 38:24-41:1
[11]    Testimony of Clem Dalrymple.
[12]    R. Doc. 220 at 1 ¶ 4.
[13]    Winkler Transcript at 47:19-23.
[14]    Winkler Transcript at 25:14-25.
[15]    Winkler Transcript at 22:25-23:8.
[16]    Winkler Transcript at 27:14-20.
[17]    Winkler Transcript at 24:14-19.

conclusory assurance that the software is "very accurate."[18]  The Court finds that Winkler's failure to provide any information about the software undermines the reliability of his method and the conclusions based on it.

Winkler also made assumptions that supported his conclusions, and he ignored evidence that undermined them.  For example, Winkler assumed that, after the impact between the motorcycle and the USPS truck, Jones did not continue to drive the truck.[19]  On cross-examination, plaintiff's counsel asked Winkler if this assumption was consistent with a statement Jones gave, in which Jones stated that he continued to drive the truck after impact.[20]  Winkler brushed Jones' alleged statement aside, stating that "the physical evidence is inconsistent with [Jones'] statement."[21]  But like his failure to explain the crash reconstruction software, Winkler does not explain *why* the physical evidence was inconsistent with Jones' statement.  If Jones  continued to drive after the impact and steered the truck, his actions would have affected the final orientation of the USPS truck, a key link to Winkler's conclusion.

Moreover, Winkler's conclusion that the USPS truck entered Highway 22 from a private driveway is countered by Bryant's credible eyewitness testimony. As noted, Bryant, a fact witness with no pecuniary interest in this lawsuit,  testified

---

[18]    Winkler Transcript at 24:23-24.
[19]    Winkler Transcript at 48:22-49:4.
[20]    Winkler Transcript at 49:5-11.
[21]    Winkler Transcript at 49:15-19.

that USPS truck was on the eastbound shoulder of the road before the accident.[22]
Dalrymple gave similar testimony.[23]  In light of the above evidence, the Court finds
that the USPS truck entered Highway 22 from the eastbound shoulder of the road.

### 2.    *The USPS Truck U-Turned into Dalrymple*

As Dalrymple drew nearer to the USPS truck, the USPS truck attempted a
U-turn across the eastbound lane.[24]  As the USPS truck was in the midst of turning
into the eastbound lane from the highway's shoulder, plaintiff struck its left-front
side while on his motorcycle.[25]

Plaintiff testified that he was thrown from his motorcycle and that he flew
inside the USPS truck's open left door, striking the windshield.[26]  Bryant described
the accident as an "explosion"[27] and testified that he saw "dust and something
flying out from" over the top of the USPS truck.[28]  Bryant testified that he brought
his car to a stop, put his hazard lights on, and dialed 9-1-1.[29]  Bryant then got out
of his vehicle, walked up to the scene of the crash, and saw Dalrymple "laying in a
puddle of blood."[30]

---

[22]    Ronald Bryant Transcript at 36:9.
[23]    Testimony of Clem Dalrymple.
[24]    Testimony of Clem Dalrymple; Bryant Transcript at 37:22-38:3.
[25]    Testimony of Clem Dalrymple.
[26]    Testimony of Clem Dalrymple.
[27]    Bryant Deposition Transcript at 40:4-10.
[28]    Bryant Deposition Transcript at 40:4-10.
[29]    Bryant Transcript at 45:17-25.
[30]    Bryant Transcript at 53:6-7.

A police officer, Jereme Brignac, arrived on the scene at 5:32 p.m.[31]  Brignac investigated the accident at the scene, and after his investigation, he  cited Jones for failure to yield.[32]  Dalrymple, injured from the crash, was airlifted to North Oaks Hospital by the Acadian Ambulance Service.[33]

### B.    The Injuries Caused by the Crash

1.    *The Injuries Apparent on January 15, 2017 and Treatment at North Oaks Hospital*

As a result of the motorcycle crash, Dalrymple arrived at North Oaks Hospital with impaired consciousness,[34] but he was able to answer questions intermittently in the emergency room.[35]  The medical records and testimony of plaintiff's treating physicians indicate that Dalrymple had an open left wrist fracture,[36] fractures in his right wrist,[37] open fractures in both hands (including in

---

[31]    Plaintiff's Exhibit 1 at 3.

[32]    *See* Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple; *see also* Exhibit 1 at 3.

[33]    Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.

[34]    The records indicate that Dalrymple arrived at the hospital with a Glascow Coma Scale (GCS) score of 14/15.  Duke Transcript at 10:12-11:7.  Duke opined that the GCS measures "eye opening, motor response, and verbal response" and that "one point was taken off for one of those categories," but the chart did not "specify which category it was taken off from."  Duke Transcript at 11:4-7.  Referencing another medical record, Duke noted that Dalrymple's chart reflected "13 to 15" at arrival on the GCS.  Duke Transcript at 34:22-23. Duke opined that it is not unusual for there to be variances in GCS scores.  Duke Transcript at 34:24-35:7. Morse opined that a GCS score of 13 indicated that Dalrymple was "probably not very responsive."  Morse Transcript at 10:24 to 11:2.

[35]    Peltier Transcript at 6:21-25.

[36]    Morse Transcript at 18:11-13.

[37]    Watson Transcript at 73:18-19.

the right metacarpal bone),[38] multiple pelvic fractures (specifically, a left pubic ramus fracture,[39] a fracture in the sacral ala,[40] and a fracture to the left pubic root[41]), a laceration of the right eyebrow,[42] a subarachnoid hemorrhage (bleeding outside of the brain, but inside the skull),[43] a nasal fracture,[44] a nasal septum fracture,[45] multiple right orbital fractures (the bone around one's eye),[46] a fracture in his frontal sinus,[47] puncture wounds in the face and neck,[48] shortness of breath,[49] and multiple abrasions.[50]  The Court finds that all of these injuries were caused by the motorcycle crash.[51]

---

[38]    Morse Transcript at 18:11-17; *id.* at 19:8-10; *see also* Duke Transcript at 33:20-23.

[39]    Morse Transcript at 19:6-7.

[40]    Duke Transcript at 24:5-18.

[41]    Duke Transcript at 26:8-11.

[42]    Morse Transcript at 19:14-15; *see also* Duke Transcript at 34:9.

[43]    Duke Transcript at 20:25 to 21:7.

[44]    Duke Transcript at 22:22.  Duke describes the general "nasal fracture" as a fracture in the "bones on the outside in the base of the nose that you can see."  Duke Transcript at 37:1-3.

[45]    Duke Transcript at 36:22-37:4.  Duke describes the "nasal septum fracture" as a fracture in "the bone in the middle that separates your right and left."  Duke Transcript at 37:1-4.

[46]    Duke Transcript at 23:11-14, 35:22-36:18.

[47]    Peltier Transcript at 8:5-9.

[48]    Duke Transcript at 34:13-14.

[49]    Morse Transcript at 10:24-25.

[50]    Duke Transcript at 37:10.

[51]    *See generally* Duke Transcript at 38:1-11; Peltier Transcript at 12:9-12.  Dr. Kevin Watson, the Government's independent medical examination (IME) physician, also opined that the motorcycle crash caused plaintiff to sustain fractures to his left wrist, right wrist, and pelvis.  Watson Transcript at 28:4-16.

Soon after his admission the hospital, the staff at North Oaks began treating Dalrymple with drugs. At 5:54 p.m., Dalrymple received Decadron, a steroid.[52] At 5:58 p.m., the hospital treated Dalrymple with morphine (an opioid)[53] and a "paralytic" drug called Ketamine.[54] At 6:00 p.m. the hospital administered an anesthetic agent called Anectine, which was used for intubation.[55] At 6:14, the hospital administered Diprivan to Dalrymple which placed him into a deep state of sedation.[56] At 9:27 p.m., the hospital collected Dalrymple's urine, which would later test positive for opioids.[57]

Dr. James Kinnett, an orthopedic surgeon at North Oaks Hospital, performed two surgeries on Dalrymple on the evening of his arrival at the hospital. Dr. Kinnett performed an "[i]rrigation, debridement, and primary closure of complex lacerations" on Dalrymple's right hand.[58] Next, Dr. Kinnett performed a debridement and an "open reduction of the fracture dislocation" on Dalrymple's left wrist.[59] For this procedure, Kinnett also used "Kirschner wires" to stabilize

---

[52]    Morse Transcript at 11:23 to 12:9; *see also* Plaintiff's Exhibit 31 (Exhibit to Morse's Deposition Marked Exhibit 1 at 554).
[53]    Morse Transcript at 12:11-17.
[54]    Morse Transcript at 12:11-17.
[55]    Morse Transcript at 13:7-10.
[56]    Morse Transcript at 13:24 to 14:2.
[57]    Plaintiff's Exhibit 31 (Exhibit to Morse's Deposition Marked Exhibit 2 at 44-45).
[58]    Plaintiff's Exhibit 17 at 56.
[59]    Plaintiff's Exhibit 17 at 59-60.

Dalrymple's left wrist.[60]  Dalrymple was kept under general anesthesia for both surgeries.[61]

On the day after the accident, January 16, 2017, Dr. Jacques Peltier examined Dalrymple's facial fractures.[62]  Peltier testified that Dalrymple was "sedated and intubated" and that, from Dalrymple's bedside, he "grabbed [Dalrymple's] nose and pushed it to where it would be hopefully pretty midline."[63] As to the other facial injuries, Peltier testified that "[t]he other fractures that he had, the frontal sinus fracture, the orbital fractures, appeared to be—they were broke, but they appeared like they would heal without any kind of long-term problems."[64]  As a result, Peltier testified that "we just left them alone."[65]

On January 17, 2017, Dr. Kinnett performed a second (but not final) surgery on Dalrymple's left wrist.[66]  The medical records indicate that the "temporary Kirschner wires were removed" and that "an incision was made on the volar aspect of the wrist."[67]  Next, "a plate [was] placed on the volar aspect of the distal radius,"[68] and the "plate was then fixed to the distal shaft . . . with cortical

---

[60]    Plaintiff's Exhibit 17 at 60.
[61]    Plaintiff's Exhibit 17 at 57; Plaintiff's Exhibit 17 at 59.
[62]    Peltier Transcript at 11:18-25.
[63]    Peltier Transcript at 10:16-25; 11:18-19.
[64]    Peltier Transcript at 11:1-6.
[65]    Peltier Transcript at 11:5-6.
[66]    Morse Transcript at 26:5-7.
[67]    Plaintiff's Exhibit 17 at 61.
[68]    Plaintiff's Exhibit 17 at 61.

screws."[69]  Dalrymple remained under the care of the staff at North Oaks Hospital until his discharge on January 31, 2017.

      2.    *Treatment and Injuries Apparent After Initial Admission to North Oaks Hospital*

On January 31, 2017, Dalrymple was discharged to North Oaks Rehabilitation Hospital for inpatient care.[70]   There, Dalrymple underwent "comprehensive therapies," which included physical therapy,[71] occupational therapy,[72] as well as speech therapy.[73]   He continued to received narcotic pain medication.[74]   While in the rehabilitation facility, Dalrymple required assistance with eating, drinking, dressing, using the restroom, and bathing.[75] On February 8, 2017, he reported to his healthcare providers that "[t]he pain is unbearable."[76] When he was discharged from the rehabilitation facility on February 9, 2017, the discharge notes recommended "24 hour supervision and assistance" for Dalrymple.[77]   The discharge notes also recommended additional outpatient therapy.[78]

---

[69]    Plaintiff's Exhibit 17 at 61.
[70]    Watson Transcript at 84:5-7.
[71]    Plaintiff's Exhibit 12 at Page 2616.
[72]    Plaintiff's Exhibit 12 at Page 2616.
[73]    Plaintiff's Exhibit 12 at Page 2636.
[74]    Plaintiff's Exhibit 12 at Page 2616.
[75]    Plaintiff's Exhibit 12 at Page 2665-2666.
[76]    Plaintiff's Exhibit 12 at Page 2647.
[77]    Plaintiff's Exhibit 12 at Page 2667.
[78]    Plaintiff's Exhibit 12 at Page 2667.

On March 6, 2017, Dalrymple returned to the hospital, reporting that he was experiencing double vision.[79]   Dr. Peltier testified that double vision is "very common" in people who have suffered "facial fractures involved in motor vehicle accidents," but that when a patient is "intubated and [their] face is super swollen, it's hard to know" whether one's double vision is likely to extend beyond the short term.[80]   Upon examining him, Peltier concluded that Dalrymple "had some double vision on upward gaze" but that the condition "was probably something that could be left alone that would maybe resolve over time."[81]   The Court finds that Dalrymple's double vision was caused by the accident.

The medical records reflect that Dalrymple continued to seek treatment through the spring of 2017.  On March 13, 2017, Dalrymple reported to health care providers that he continued to experience pain in his left hand, elbow, and shoulder.[82]  He was prescribed narcotic pain medication on March 20, 2017,[83] and again on April 17, 2017.[84]  Dalrymple reported "9/10" pain in his wrist to health care providers at North Oaks Rehabilitation Hospital on May 10, 2017.[85]

---

[79]     Peltier Transcript at 13:8-14:3.
[80]     Peltier Transcript at 13:8-18.
[81]     Peltier Transcript at 15:8-18.
[82]     Plaintiff's Exhibit 13 at 254.
[83]     Plaintiff's Exhibit 14 at 96.
[84]     Plaintiff's Exhibit 14 at 116.
[85]     Plaintiff's Exhibit 13 at 1168.

a.   *Dalrymple's Back Injuries and Continued Treatment to His Left Wrist*

At trial, the parties disputed whether the accident caused Dalrymple to require surgery on his back.  Four months after his discharge, on May 22, 2017, Dalrymple contacted North Oaks Hospital seeking a referral for a "back doctor."[86] In June and July of 2017, Dalrymple met with Marc Pitre, a physician assistant to spine surgeon, Dr. Matthew LaFleur, for his back pain.  Initially, Dalrymple was treated solely by Pitre, who had an MRI taken of Dalrymple's back and recommended physical therapy.[87]  But by the end of July 2017, Dalrymple reported to Pitre that the physical therapy was not alleviating his symptoms.[88]  On August 28, 2017, Dalrymple met with LaFleur for the first time.  LaFleur recommended transforaminal epidural steroid injections to treat Dalrymple's back pain.[89]

While Dalrymple was seeking treatment for his back pain in the summer and fall of 2017, he also sought further treatment for nerve palsy in his left wrist.  On September 19, 2017, Dr. Kinnett performed a third surgery on Dalrymple's left wrist—placing him under general anesthesia.[90]  Dr. Kinnett's operative notes indicate that "the motor branch of the median nerve was identified and carefully decompressed."[91]  The notes also indicate that Kinnett decompressed the radial

---

[86]   LaFleur Transcript at 66:8-20; *see also* Plaintiff's Exhibit 33 (Exhibit to LaFleur's Deposition Marked Exhibit 4 at 158).
[87]   LaFleur Transcript at 17:6-15; 27:9.
[88]   Testimony of Clem Dalrymple.
[89]   LaFleur Transcript at 30:16-17.
[90]   Morse Transcript at 27:10-18.
[91]   Plaintiff's Exhibit 17 at 3844.

nerve.[92]  Dalrymple was discharged on the same day.[93]  Dr. Kinnett's operative note ties Dalrymple's nerve palsy in the left wrist to the fracture Dalrymple suffered from the motorcycle accident.  The note indicates that Dalrymple "sustained severely comminuted fracture of the [left] distal radius" and developed "documented entrapment of the dorsalis manus radialis nerve."[94]  The Court finds that Dalrymple's median nerve palsy, radial nerve palsy, and need for surgical intervention were caused by the accident.

After the third surgery to his left-wrist, Dalrymple sought treatment again for his back pain.  On October 9, 2017, Dalrymple met with LaFleur, who again recommended "[e]pidural steroid injections," as well as physical therapy.[95]  Given that Dalrymple's pain had persisted, Lafleur testified that "[a]t that time" he began to consider Dalrymple for surgery.[96]  Ultimately, LaFleur performed spinal surgery on Dalrymple on January 10, 2018, performing a multilevel lumbar fusion, laminectomy, and nerve decompression.[97]

---

[92]     Plaintiff's Exhibit 31 (Exhibit to Morse's Deposition Marked Exhibit 4 at 3846).

[93]     Plaintiff's Exhibit 17 at 3844.

[94]     Plaintiff's Exhibit 31 (Exhibit to Morse's Deposition Marked Exhibit 4 at 3845).

[95]     LaFleur Transcript at 32:10-11.

[96]     LaFleur Transcript at 32:12-22.

[97]     LaFleur Transcript at 57:18; *see also* Plaintiff's Exhibit 33, (Exhibit to LaFleur's Deposition Marked "Da. L-18," at 4349) (medical record indicating that LaFleur performed the following "procedures": a "[p]osterior lumbar interbody fusion L5-S1," a [l]ateral extracitary lumbar interbody fusion L4-L5," "posterior segmental instrumentation L4 through S1," a "[l]aminectomy L5," a "central decompression with interlaminar device placement L3-L4" and others).

Testifying in "layman's terms," LaFleur stated that the surgery consisted of taking Dalrymple's "discs essentially completely out and replac[ing] them with bone graft" and putting "in some screws to . . . allow that bone graft to heal."[98] LaFleur also testified that "we cut out a bunch of bone and disc that appeared to be pressing on the patient's nerve roots."[99]  After surgery, Dalrymple stayed at North Oaks Hospital for five days until he was discharged on January 23, 2018.[100] LaFleur also testified that Dalrymple would have been in a brace for six weeks to three months, but he could not remember how long he kept Dalrymple in a brace.[101]  As to the cause of Dalrymple's back pain, LaFleur opined that Dalrymple's "symptoms that required surgery were caused by the motor vehicle accident."[102]

The Government contends that Dalrymple's back injuries are not related to the motorcycle crash.  The Government's IME expert, Dr. Kevin Watson, testified that the injuries to the lumbar spine were "degenerative changes"—a product of aging—which preexisted the accident.[103]  Watson opined that the post-accident MRI of Dalrymple's lumbar spine revealed the typical "wear and tear and arthritic process" of someone in their 50s.[104]  Watson also testified that he reviewed CT scans taken of Dalrymple's abdomen and pelvis in 2014 and noticed arthritis in

---

[98]     LaFleur Transcript at 39:11-16.
[99]     LaFleur Transcript at 39:16-18.
[100]    LaFleur Transcript at 43:4.
[101]    LaFleur Transcript at 44:7-11.
[102]    LaFleur Transcript at 63:7-9.
[103]    Watson Transcript at 47:18-22, 50:3 to 51:3.
[104]    Watson Transcript at 49:7-16.

Dalrymple's lumbar spine.[105]  As a result, Watson concluded that Dalrymple's back pain was not caused by the accident.[106]

The Court finds LaFleur's testimony more persuasive than Watson's on this issue.   First, LaFleur accounted for Dalrymple's lack of back symptoms before the accident.  LaFleur reasoned that because Dalrymple "did not have any back pain prior to" the accident, he could not "come up with another explanation for him requiring surgery," other than the motorcycle accident.[107]  Watson did not account for Dalrymple's lack of symptomology before the accident.

Second, LaFleur testified that there were "acute changes" on the post-accident MRI.[108]  Specifically, Lafleur indicated that there was a "an area of high T2 signal intensity" at the L4-L5 level.[109]  LaFleur testified that this "impl[ied] that [Dalrymple suffered] an acute injury."[110]  Watson did not address this acute finding on the MRI.

Third, LaFleur testified that, to the extent Dalrymple had any back conditions that pre-existed the accident, the impact of the crash could have caused his condition to become symptomatic.  He said, "absorbing that amount of energy could cause a previously asymptomatic [condition] to become symptomatic."[111]

---

[105]    Watson Transcript at 24:13-25:2.
[106]    Watson Transcript at 53:5-13.
[107]    LaFleur Transcript at 50:1-25.
[108]    LaFleur Transcript at 50:13.
[109]    LaFleur Transcript at 50:19-22.
[110]    LaFleur Transcript at 50:19-22.
[111]    LaFleur Transcript at 51:18-21.

Watson did not account for the impact that the trauma of the motorcycle crash could have on Dalrymple's back. "It is settled law that 'a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct.'" *Baack v. McIntosh*, 304 So. 3d 881, 905 (La. App. 3 Cir. 2020) (quoting *Lasha v. Olin Corp.*,625 So. 2d 1002, 1005 (La. 1993)).  Because Watson's testimony fails to account for Dalrymple's lack of symptomology before the accident, does not address the acute finding on the MRI, and does not consider the potential impact of the trauma of the motorcycle accident in worsening any pre-existing back condition, the Court credits LaFleur's testimony and finds that Dalrymple's back surgery was necessitated by the motorcycle crash.

        b.    *Surgery and Treatment More Than One Year After the Accident*

Dalrymple continued to receive treatment for his injuries through the spring of 2018.  On February 26, 2018, more than one year after the accident, Dr. Kinnett performed another surgery on Dalrymple to fuse his left wrist.[112]  The lengthy operative note for this surgery indicates that "[t]he plate and screws were identified and removed" and that an "autograft was harvested and impacted into the area."[113] Dalrymple was discharged from the hospital on the same day.[114]  Dalrymple also

---

[112]    Plaintiff's Exhibit 17 at 5298.  The medical records describe the procedure as "[a]rthrodesis with synthes, arthrodesis plate, allograft, and autograft, left wrist."  *Id.*  Dr. LaFleur refers to this surgery as a "fusion."  LaFleur Transcript at 44:24-45:1.

[113]    Plaintiff's Exhibit 17 at 5300.

[114]    Plaintiff's Exhibit 17 at 5300.

had appointments with Dr. LaFleur after his back surgery on February 2, 2018,[115] March 2, 2018,[116] and June 22, 2018.[117]  LaFleur indicated that Dalrymple did not require narcotic pain medication as of any of those visits.[118]  On June 22, 2018, LaFleur "considered Dalrymple completely recovered from [his back] surgery,"[119] and he "was allowed to do whatever he want[ed] at that point."[120]

### 3.   *Alleged Injuries that Plaintiff Fails to Show Are Caused by the Crash*

Plaintiff claims other injuries but fails to show they are causally related to the crash.  For example, Dalrymple asserts that he suffers from Erectile Dysfunction,[121] which he alleges was caused by the motorcycle accident.  But Dalrymple does not point to any medical records, or any testimony from a medical professional, indicating that this alleged condition is related to the motorcycle accident.  Nor did Dalrymple ever complain to a medical professional about Erectile Dysfunction.[122]  In addition, Dalrymple contends that he suffers from intractable vomiting[123] and gastroesophageal reflux disease (GERD),[124] which he likewise relates to the crash.  But Dalrymple testified that he suffered from these

---

[115]   LaFleur Transcript at 43:8-9.
[116]   LaFleur Transcript at 44:16.
[117]   LaFleur Transcript at 45:3.
[118]   LaFleur Transcript at 43:12; 44:21; 46:2.
[119]   LaFleur Transcript at 47:23-24.
[120]   LaFleur Transcript at 47:24-25.
[121]   R. Doc. 217 at 6 ¶ 44.
[122]   Testimony of Clem Dalrymple.
[123]   R. Doc. 221 at 17.
[124]   R. Doc. 226 at 5.

conditions before the accident.[125]   Indeed, the parties stipulated that Dalrymple

had been admitted to the hospital ten times before the accident, beginning in 2014,

for these issues.[126]   No medical expert has opined that Dalrymple's stomach and

GERD conditions were caused by or worsened as a result of, the motorcycle

accident.   Accordingly, the Court finds that Dalrymple fails to demonstrate that

these injuries are related to the crash.

### C.     Defendant's Liability

The FTCA constitutes a "limited waiver of sovereign immunity, making the

Federal Government liable to the same extent as a private party for certain torts of

federal employees acting within the scope of their employment." *United States v.*

*Orleans*, 425 U.S. 807, 813 (1976); 28 U.S.C. §§ 1346(b), 2674.   The parties

stipulate that Jones was acting in the course and scope of his employment with

USPS at the time of the accident.[127]   In a suit under the FTCA, "[t]he court will

examine the law of the state where the negligent act or omission occurs to

determine liability." *Tindall ex rel. Tindall v. United States*, 901 F.2d 53, 55 (5th

Cir. 1990).   The alleged negligent act occurred in Louisiana.[128]

---

[125]     Testimony of Clem Dalrymple.

[126]     Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.

[127]      *See* Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.

[128]     *See* R. Doc. 1 at 2 ¶ III; Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.

Louisiana Civil Code Article 2315 provides that "[e]very act whatever of man that causes damage to another obliges his by whose fault it happened to repair it." In imposing liability under Article 2315, Louisiana courts employ a duty-risk analysis which requires a plaintiff to establish that: "(1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to that standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element)." *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (applying Louisiana law); *see also Lemann v. Essen Lane Daiquiris*, 923 So. 2d 627, 633 (La. 2006) (providing these requirements). A plaintiff's failure to prove any one of these elements results in a determination of no liability. *Knight v. Kellogg Brown & Root Inc.*, 333 F. App'x 1, 6 (5th Cir. 2009) (applying Louisiana law).

With respect to the first component, the duty Jones owed to Dalrymple, "[t]he driver entering a highway has the *primary* duty to avoid collision." *Walley v. Vargas*, 104 So. 3d 93, 105 (La. App. 1 Cir. 2012) (emphasis in original). "*Unusual, extreme, and high care* toward favored traffic is required of such a motorist under the case law." *Id.* (emphasis in original) (collecting cases). The Court finds that Jones owed Dalrymple a duty of "unusual, extreme, and high care" as Jones was entering the highway.

19

As to the second requirement, breach, the Court finds that Jones breached his high duty of care.  "Generally, breach of a duty is the failure to exercise reasonable care under the circumstances."  *Miller v. Shelter Ins*., 266 So. 3d 347, 352 (La. App. 3 Cir. 2019).  But as explained above, Louisiana imposes a duty of "unusual, extreme, and high care," rather than reasonable care, on drivers entering a favored stream of traffic.  *Walley*, 104 So. 3d at 105 (collecting cases).  Jones breached his duty of care in failing to yield to Dalrymple when he performed a U-turn from the shoulder of the road. *Baack*, 304 So. 3d at 899 (noting driver was "one hundred percent at fault" for causing accident in attempting to make a U-turn from the shoulder of the westbound lane).  Indeed, officer Brignac cited Jones for failure to yield under Louisiana Revised Statute § 32:104.[129]  At trial, plaintiff testified that he did not even have time to apply his breaks, let alone come to a full stop, before he collided with the mail truck.[130]

The Government does not explain the import of suggesting that Jones was entering Highway 22 from a private driveway, rather than from the eastbound shoulder.  Importantly, Jones would have breached his duty of care in failing to yield under either circumstance.  *See Davis v. Galilee Baptist Church*, 486 So. 2d 1021, 1024 (La. App. 2 Cir. 1986) (providing that "[a] motorist who is about to enter a roadway from a private driveway is required to yield the right of way to all approaching vehicles so close as to constitute an immediate hazard" and that a

---

[129]    Plaintiff's Exhibit 1 at 3.
[130]    Testimony of Clem Dalrymple.

motorist entering from a private driveway owes "[u]nusual, extreme, and high care toward favored traffic"). Even Winkler, the Government's accident reconstruction expert who opined that Jones entered Highway 22 from a private driveway, testified that it was "fair" to say that "the post office truck pulled out without yielding to Mr. Dalrymple so close that Mr. Dalrymple didn't have a chance to take any evasive action."[131] This evidence establishes that Jones breached his duty of care.

As to the third requirement, the Court also finds that Jones' failure-to-yield was the cause-in-fact of the accident. Louisiana case law is clear that cause-in-fact is usually a "but for" inquiry, "which tests whether the accident would or would not have happened but for the defendant's substandard conduct." *Perkins v. Entergy Corp.*, 782 So. 2d 606, 611 (La. 2001).[132] But-for causation requires a plaintiff to "prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred." *Henrickson v. Guillory*, 15 So. 3d 256, 259 (La. App. 4 Cir. 2009) (citing *Roberts v. Benoit*, 605 So. 2d 1032 (La. 1991)). Had Jones not pulled out into the eastbound lane of Highway 22 and failed to yield to Dalrymple, the accident would not have

---

[131]   Winkler Transcript at 65:14-23.

[132]   The "substantial factor" test applies as an alternative only "[w]hen there are concurrent causes of an accident which nevertheless would have occurred in the absence of one of the causes." *Boykin v. Louisiana Transit Co.*, 707 So. 2d 1225, 1232 n.10 (La. 1998). There is no evidence to suggest that there were "concurrent causes" of the accident, nor does either party argue that the Court ought to depart from the usual but-for inquiry. Accordingly, the Court asks whether Jones' conduct was the but-for cause of the accident.

occurred.  The Court finds that Jones' failure to yield was the but-for cause of the accident.

The fourth element, scope of duty (sometimes called "legal cause"), asks whether the plaintiff's injury was one of the risks encompassed by the rule of law that imposed the duty.  *See Fowler v. State Farm Fire & Cas. Ins.*, 485 So. 2d 168, 170 (La. App. 2 Cir. 1986).  As the Louisiana Supreme Court put it, "[t]he scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty."  *Faucheaux v. Terrebonne Consol. Gov't*, 615 So. 2d 289, 293-94 (La. 1993).  "[T]he proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced."  *Id.* at 294.  To answer this question, the Court need look no further than the plain language of the failure-to-yield statute itself: "[n]o person shall . . . turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with *reasonable safety*."  La. Rev. Stat. § 32:104.  The statute is concerned with preserving the "safety" of those who could be harmed by the behavior the statute proscribes.  The safety of both Dalrymple and Jones was compromised by Jones' failure to yield.  The Court finds legal cause.

As to the fifth, and final, component of the duty-risk analysis, the Court finds that plaintiff has shown "actual damages" because he suffered serious bodily harm in the accident.  *See Berg v. Zummo*, 786 So. 2d 708, 710, 716 (La. 2001) (concluding that "actual damages were proven" when plaintiff had suffered "serious bodily harm"); *see also* discussion, *supra*, at II.B (finding Dalrymple's

injuries caused by the accident).  Having found all of the elements of Article 2315 satisfied, the Court finds that Jonathan Jones negligently failed to yield to Dalrymple, which caused the accident-related injuries the Court set out above.

Because the parties stipulated at trial that Jones was acting in the course and scope of his employment with USPS at the time of the accident,[133] the Court finds that the United States of America is liable for Jones' negligence.  28 U.S.C. §§ 1346(b), 2674; *Orleans*, 425 U.S. at 813 (noting that the FTCA makes "the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment").

### D.    No Comparative Fault

Louisiana Civil Code Article 2323 provides "[i]n any action for damages where a person suffers injury . . . the degree or percentage of fault of all persons causing or contributing to the injury . . . shall be determined."  Further, "[i]f a person suffers injury . . . as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury."  La. C. C. art 2323.  "A party asserting comparative fault bears the burden of proof by a preponderance of the evidence that the other party's fault was a cause in fact of the damage complained

---

[133]    *See* Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.

of." *Pruitt v. Nale*, 46 So. 3d 780, 783 (La. App. 2 Cir. 2010) (collecting cases). The Government thus bears the burden of showing comparative fault.

The Government fails to meet its burden to show that any conduct by Dalrymple caused or contributed to the accident.  There is no evidence, for example, that Dalrymple was speeding.  Indeed, Dalrymple testified that, just before the accident, he checked his speedometer to make sure he was not speeding.[134]   Nor is there evidence that Dalrymple was driving erratically, or that he took his eyes off the road before the accident.  In an effort to show comparative fault, the Government makes three arguments: (1) that the headlight on Dalrymple's motorcycle was off, (2) that Dalrymple was under the influence of drugs, and (3) that Dalrymple was not wearing a helmet.  On each of these, the Government fails to carry its burden.

As to the first issue—the motorcycle's headlight—the Government invokes the testimony of its accident reconstruction expert, Wayne Winkler.  But in a pretrial ruling, the Court excluded Winkler's opinion that Dalrymple's headlight was off as the product of speculation.[135]

---

[134]    Testimony of Clem Dalrymple.

[135]    *See* R. Doc. 225 at 2.  Winkler also attempted to show that Dalrymple's motorcycle was "manufactured prior to the federal mandates that headlights be hardwired so they're on all the time."  Winkler Transcript at 33:22-25.  But on cross-examination, Winkler admitted that the motorcycle involved in this accident was manufactured in 1979, *see* Winkler Transcript at 40:18, and that the source material upon which Winkler relied for this point—a document called the Louisiana Motorcycle Operator Manual—indicates that all motorcycles manufactured *after 1978* had their headlights hardwired on.  Winkler Transcript at 41:21-42:3; Winkler Transcript at 43:21-44:10.  Moreover, even if the headlight

24

As to the second argument—Dalrymple's alleged drug use—the Government fails to prove that Dalrymple was under the influence of any drug at the time of the accident.  In Louisiana, "all motorists have a duty not to drive while intoxicated," and Louisiana courts look to a driver's potential intoxication when assessing comparative fault.  *Lopez v. Cosey*, 214 So. 3d 18, 23 (La. App. 1 Cir. 2017).  The Government's theory is that Dalrymple was either under the influence of marijuana (THC), opiates, or both, at the time of the crash.[136]  In support of its position, the Government offered evidence showing that, at various times in his life, Dalrymple used those drugs.[137]  On cross-examination of Dalrymple, for example, the Government pointed to a 2014 drug test in which plaintiff tested positive for opioids and THC.[138]  At trial, the parties stipulated that Dalrymple used marijuana in the past.[139]

But the Government points to no evidence establishing that Dalrymple was under the influence of any drugs *at the time of the accident*.  In an attempt to make this showing, the Government points to the results of Dalrymple's urinalysis at

---

was not hardwired on, the Government still has not provided any persuasive evidence that Dalrymple failed to turn on his headlight.

[136]   R. Doc. 220 at 3.

[137]   *See, e.g.*, R. Doc. 220 at 3 ¶ 20 (noting by stipulation that plaintiff admits he has smoked marijuana in the past); *id.* at 3 ¶¶ 21, 23, 24 (indicating that plaintiff has previous DWI convictions and tested positive for opioids and marijuana in 2014).

[138]   Testimony of Clem Dalrymple.

[139]   *See* Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.

North Oaks Hospital on the evening of the accident.[140]   To be sure, the medical records show that Dalrymple tested positive for opioids and for marijuana (THC) the night of the accident.[141]   But the evidence shows that Dalrymple was given opioids by the staff at North Oaks *before* he was tested for them.[142]   As to the marijuana, Dr. Watson (the Government's IME expert), testified that THC can stay in a person's system for "a week to a couple of weeks."[143]   At trial, Dalrymple testified that he did not use drugs on the day of the accident or the day before.[144] The Government bears the burden of showing Dalrymple was intoxicated, and it has failed to carry that burden.   As a result, the Court finds that Dalrymple was not impaired by drugs at the time of the accident.

The Government's third argument on comparative fault was that  Dalrymple was not wearing a helmet at the time of the accident.[145]   The evidence points to the contrary:  Dalrymple testified he was wearing a helmet;[146] "triage notes" taken by

---

[140]    *See* R. Doc. 220 at 2 ¶ 15.

[141]    Plaintiff's Exhibit 31 (Exhibit to Morse's Deposition Marked Exhibit 2 at 44-45).

[142]    *See* Morse Transcript at 16:15.

[143]    Watson Transcript at 60:9-10.

[144]    Testimony of Clem Dalrymple.

[145]    Louisiana courts address this issue within the context of the broader comparative fault inquiry.  *See, e.g*., *Moffitt v. Sewerage & Water Bd. of New Orleans*, 40 So. 3d 336, 345 (La. App. 4 Cir. 2010) (assessing a motorcyclists failure to wear a helmet within the broader comparative fault inquiry); *Landry v. Doe*, 597 So. 2d 14, 19-20 (La. App. 1 Cir. 1992) (assigning contributory fault to the operator of a motorcycle for not wearing a helmet in a parking lot the motorcyclist knew was riddled with potholes).

[146]    Testimony of Clem Dalrymple.

the nurses at North Oaks Hospital just as Dalrymple arrived,[147] read, "[patient] was wearing helmet;"[148]  and a helmet was among Dalrymple's personal belongings that followed him to the hospital from the scene of the crash.[149]  The Prehospital Care Report Summary, which includes information relevant to Acadian Ambulance Service's contact with Dalrymple, includes the following two words: "helmet used."[150]  Dalrymple also testified that he received the helmet back after the accident and that it was "all scratched up."[151]

Having found that the Government failed to carry its burden on each of its comparative fault theories, the Court finds that that there is no comparative fault. Accordingly, the Court assigns 100% fault to the Government, and 0% fault to Dalrymple.

### E.    Damages

Notwithstanding the Government's liability, the burden is on the plaintiff to prove his damages.  *LeBlanc v. Allstate Ins.*, 772 So. 2d 400, 405 (La. App. 5 Cir. 2000).  "A judgment awarding no damages is valid where plaintiff fails to prove damages caused by the tortious act of the defendant, even though the defendant is

---

[147]    Duke Transcript at 10:6-8.
[148]    Plaintiff's Exhibit 32 (Exhibit 3 attached to Duke's Deposition).
[149]    Duke Transcript at 9:4-11; Plaintiff's Exhibit 32  (Exhibit to Duke's Deposition Marked Exhibit 2 at 4037).
[150]    Plaintiff's Exhibit 32  (Exhibit to Duke's Deposition Marked Exhibit 2 at 4037).
[151]    Testimony of Clem Dalrymple.

at fault." *Unique Const. Co., Inc. v. S.S. Mini Storage, Inc.*, 570 So. 2d 161, 164 (La. App. 5 Cir. 1990).

        1.    *Lost Past Wages*

Plaintiff is entitled to lost past wages for the work he missed due to the injuries he sustained in the motorcycle accident.  Lost past wages "are the monetary losses plaintiff experienced during the interval between the date of the accident . . . and the time of trial." *Folse v. Fakouri*, 371 So. 2d 1120, 1122 (La. 1979).  "[T]o be awarded lost wages, a plaintiff must prove positively that he would have been earning the wages but for the accident in question." *Boyette v. United Servs. Auto. Ass'n*, 783 So. 2d 1276, 1279 (La. 2001) (collecting cases).

Importantly, the plaintiff bears the burden of demonstrating "the duration of time missed from work due to the accident." *Brown v. City of Madisonville*, 5 So. 3d 874, 887 (La. App. 1 Cir. 2008).  If the evidence indicates that plaintiff could have earned wages sometime before the trial, he is entitled to lost past wages only until the time he could have resumed earning wages. *See Thomas v. Boyd*, 245 So. 3d 308, 329 (La. App. 2 Cir. 2017) (awarding past lost wages for only 16 months, even though more than 36 months lapsed between the date of injury and the trial date, because the documentary evidence suggested that plaintiff could have earned wages 16 months after the injury); *see also Hammons v. St. Paul*, 101 So. 3d 1006, 1012 (La. App. 4 Cir. 2012) ( "In regards to past lost wages, the plaintiff has the burden of proving the time missed from work as a result of the injury.").

The Court proceeds by (1) ascertaining the wages plaintiff was earning at the time of the accident and (2) establishing the time period over which it will award plaintiff's lost wages.

### a.   *Past Wage Amount*

At trial, plaintiff testified that, at the time of the accident, he earned $300 per week as a diesel mechanic at Tommy's Auto Repair.[152]  He explained that he had been working at Tommy's for a year before the accident,[153] and that he worked for a lower wage than he had received in earlier jobs because he was interested in buying the business and was learning the ropes.  "A claim for lost wages . . . only requires such proof which reasonably establishes plaintiff's claim, which includes plaintiff's own reasonable testimony."  *Wendel v. Travelers Ins*., 151 So. 3d 828, 835  (La. App. 4 Cir. 2014); *see also Brown v. City of Madisonville*, 5 So. 3d 874, 887 (La. App. 1 Cir. 2008) ("Where there is no basis for a precise mathematical calculation of a past lost wage claim, the trier of fact can award a reasonable amount of damages without abusing [its] discretion.").  The Court credits plaintiff's testimony that he worked for $300-per-week at the time of the accident.

### b.   *Time Period for Lost Past Wages*

The Court must determine the time period over which to award Dalrymple's lost wages.  The Court finds that plaintiff could not have earned wages in the aftermath of the accident in 2017 and 2018 while he was undergoing multiple

---

152    Testimony of Clem Dalrymple.
153    Testimony of Clem Dalrymple.

hospitalizations, surgeries, rehabilitation, debilitating pain, and periods of recovery.

But the evidence shows that as of January 6, 2020, approximately three years after the accident, but one year before trial, Dalrymple was capable of earning wages. Plaintiff's vocational rehabilitation expert, Ronnie J. Ducote, II, evaluated Dalrymple on that date.[154] Ducote testified that he met with Dalrymple for around two hours[155] and administered a vocational test called the Wide Range Achievement Test (WRAT)[156] to test Dalrymple's reading, math, and comprehension ability.[157]   Ducote also considered Dalrymple's general background, work history, education, medical treatment, and plans for the future.[158] Ducote did not opine that Dalrymple was unable to work and found him qualified for jobs such as a box office cashier, an unarmed security guard, and an automotive dealership greeter.[159]   Ian Hegwood, the Government's vocational rehabilitation expert, opined that, as of January 14, 2020, Dalrymple was capable of earning wages in at least eleven different jobs,[160] including "automobile part salesperson, automobile repair service estimator, material handling equipment

---

[154]    Ducote Transcript at 13:23-25.
[155]    Ducote Transcript at 14:7-8.
[156]    Ducote Transcript at 16:4-8.
[157]    Ducote Transcript at 16:17-23; 33:3-14.
[158]    Ducote Transcript at 15:6-15.
[159]    Ducote Transcript at 48:24-49:3.
[160]    Defendant's Exhibit 45 at USPS 111, USPS 121.

sales representative, construction machinery sales representative, [or an] automobile service manager."[161]

Trevor Bardarson, the Government's expert physical therapist testified that he conducted a functional capacity exam (FCE) of Dalrymple on January 28, 2020.[162] Bardarson administered a number of physical tests to Dalrymple, including "strength testing . . . reflex testing, [and] sensory testing."[163] He had Dalrymple engage in a number of "lifting, carrying, pushing, and pulling" motions, as well as a test involving "stairs [and] ladders . . . working in a variety of positions."[164] Bardarson testified that "[Dalrymple] felt like he was crippled and that's not what I found at all."[165] Bardarson concluded that Dalrymple was not "capable of going back to work as a diesel mechanic,"[166] but that "light" physical activity was "very reasonable" and a "conservative" estimate of Dalrymple's physical potential.[167] Both Dr. Watson and Bardarson testified that Dalrymple had reached maximum medical improvement as of January 2020.[168]

Dalrymple has not shown he is entitled to past lost wages for the period between January 6, 2020, and February 3, 2021 (the date of trial). As noted above, Hegwood and Bardarson concluded that Dalrymple was capable of working and

---

[161]   Hegwood Transcript at 47.
[162]   Bardarson Transcript at 24:8.
[163]   Bardarson Transcript at 40:1-2.
[164]   Bardarson Transcript at 40:24 to 41:5.
[165]   Bardarson Transcript at 62:1-7.
[166]   Bardarson Transcript at 52-53.
[167]   Bardarson Transcript at 62:1-11.
[168]   Watson Transcript at 31:21-25; Bardarson Transcript at 27:19-24.

earning wages in January 2020, and Ducote did not opine that he could not.  And by all accounts, Dalrymple could have earned wages at a rate higher than his $300-per-week pre-accident wage at Tommy's Auto Repair.  Indeed, the lowest estimate comes from Ducote, plaintiff's witness, who opined that the jobs Dalrymple was qualified for paid at least $8.00 per hour (or $320 per week/$16,640 per year) as of January 6, 2020.[169]  The Court finds that Dalrymple has not carried his burden to show that he is entitled to past lost wages from January 6, 2020 to February 3, 2021.  *See Boyette*, 783 So. 2d at 1279 (holding that plaintiff must positively prove he would have been earning wages but for the accident in question to recover past lost wages).

The Court awards lost past wages (at $300 per week) for the time between the date of the accident January 15, 2017, and January 6, 2020, the date of Ducote's vocational evaluation (155 weeks).  "The calculation of past lost wages involves multiplying the monthly wages by the relevant time period . . . ."  *Worsham Hetrick*, 777 So. 2d 1280, 1285 (La. App. 2 Cir. 2001); *see also Thomas v. Boyd*, 245 So. 3d 308 (La. App. 2 Cir. 2017) (awarding lost past wages not up until the trial date, but until the date that the evidence showed plaintiff could earn wages).  The Court awards Dalrymple $46,500 in lost past wages.

---

[169]     Ducote Transcript at 57:14-19.

2.   *Lost Future Earnings or Future Earning Capacity*

Dalrymple is also entitled to an award for lost future earnings or future earning capacity.[170]  "'Loss of earning capacity is not the same as lost wages.'" *Engles v. City of New Orleans*, 872 So. 2d 1166, 1181 (La. App. 4 Cir. 2004) (quoting *Finnie v. Vallee*, 620 So. 2d 897, 900-01 (La. App. 4 Cir. 1993)).  Rather, the award for lost future earnings or earning capacity is "estimated on the injured person's *ability* to earn money, rather than what he actually earned before the injury." *Hobgoon v. Aucoin*, 574 So. 2d 344, 346 (La. 1990) (emphasis added). The Court determines this award "by deducting plaintiff's earning ability after the injury from his earning ability immediately prior to the injury." *Id.*  Courts awards future lost wages or future lost earning capacity from the date of trial to the plaintiff's expected retirement date.  *See Simpson v. U V Ins. Risk Retention Grp.*, 304 So. 3d 1002, 1016 (La. App. 3 Cir. 2020) (assessing "future lost wages/earning capacity" from the time of trial to the end of plaintiff's work life); *Bouley v. Guidry*, 883 So. 2d 1099, 1107 (La. App. 3 Cir. 2004) (same).

---

[170]   The Court notes that in a previous order it noted that "plaintiff is entitled to loss of future earning capacity in addition to loss of future wages," suggesting that these awards were distinct.  R. Doc. 181 at 12.  The Court clarifies that Louisiana courts often use the terms "lost future wages" and "lost future earning capacity" interchangeably.  *See, e.g.*, *Woods v. Hall*, 194 So. 3d 689, 693 (La. App. 1 Cir. 2016) (noting that it would "address the issue of lost future wages and lost earning capacity together because, whether the award is styled as lost future income or lost earning capacity, the same substantive law applies"); *Wendel v. Travelers Ins. Co.*, 151 So. 3d 828, 836 (La. App. 4 Cir. 2014) (using the terms "future loss of earning capacity" and "future lost wages" interchangeably); *Kessler v. Southmark Corp.*, 643 So. 2d 345, 350 (La. App. 2 Cir. 1994) (same).

"Some factors to be considered in determining loss of earning capacity include plaintiff's physical condition before and after [his] injuries, [his] age and life expectancy, [his] past work record, the amount plaintiff probably would have earned absent the injuries, the probability that []he would have continued to earn wages over the balance of [his] life, and discount and inflation rates." *Brandao v. Wal-Mart Stores, Inc.*, 803 So. 2d 1039, 1043 (La. App. 2 Cir. 2001). The calculation of loss of future earning capacity is "inherently speculative and insusceptible of calculation with mathematical certainty." *Kessler*, 643 So. 2d at 350.

a.   *Dalrymple's Pre-Accident Earning Capacity*

The evidence at trial showed that Dalrymple had a pre-accident earning capacity of $1,000 per week. Dalrymple provided business records showing that he had made $1,000 per week from January 2007 to December 2010, working for a company called Three C's Properties, Inc.[171] Plaintiff also testified at trial that he had earned $1,000 per week working as a fleet mechanic at CF trucking as recently as 2014.[172] Following 2014, plaintiff testified that he went to work on race cars for Dunning Racing where he was supposed to earn $1,000 per week, although he was not paid that amount.[173]

---

[171]   Plaintiff's Exhibit 7.
[172]   Testimony of Clem Dalrymple.
[173]   Testimony of Clem Dalrymple.

Ducote's testimony also supports the finding that Dalrymple had a pre-accident earning capacity of $1,000 per week.  Ducote opined that, given plaintiff's substantial experience working as a mechanic, he would have an annual earning capacity between $50,530 to $62,340 per year as a mechanic, were he not injured in the accident.[174]  Ducote's low-end figure of $50,530 reflects an annual salary just shy of $1,000 per week ($52,000 per year).

It is true that Dalrymple was actually earning $300 before the accident, $700 less than his purported pre-accident earning capacity of $1,000 per week. But Dalrymple offers a reasonable explanation for this difference.  According to Dalrymple, he had accepted what he viewed as a pay cut—$300 per week—at Tommy's Auto Repair in the period before the accident, because he hoped eventually to acquire the business from its owner, Tommy Flocke.[175]  Dalrymple testified that he viewed his work at Tommy's not only as an opportunity to earn wages, but also as an opportunity to "learn[] about [Tommy's] customers and everything."[176]  Further, "[w]hile the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future earning capacity." *Finnie v. Vallee*, 620 So. 2d 897, 900 (La. App. 4 Cir. 1993).

Crediting the documentary evidence from January 2007 to December 2010,[177] plaintiff's testimony that he earned $1,000 per week at CF trucking as

---

[174]   Ducote Transcript at 56:16-25.
[175]   Testimony of Clem Dalrymple.
[176]   Testimony of Clem Dalrymple.
[177]   Plaintiff's Exhibit 7.

recently as 2014,[178] his testimony about his pay arrangement at Dunning Racing after 2014,[179] and Ducote's conclusion that Dalrymple could earn between $50,530 and $62,340 as a mechanic (were he not injured in the accident), the Court finds that Dalrymple had a pre-accident earning capacity of $52,000 per year.

b.   *Dalrymple's Post-Accident Earning Capacity*

There is conflicting expert testimony on Dalrymple's post-accident earning capacity.  Ducote opined that, "should [Dalrymple] be found [able] to work at the sedentary to light physical demand level,"[180] Dalrymple would be able to earn $8.00 to $10.00 per hour.[181]  This represents an annual salary between $16,640 and $20,800.  Ducote's methodology included what he called a "Labor Market Survey."[182]  The labor market survey consisted of "contact[ing] specific employers in [Dalrymple's] geographic area to identify alternative types of jobs that he could be considered for, given his skills, his work abilities, things of that nature."[183]  Ducote emphasized that the process involves "actual communication and contact with local employers."[184]  Ducote identified a non-exhaustive list of four jobs for which Dalrymple would be qualified—a PBX operator, a box office cashier, an unarmed security guard, and an automotive dealership greeter.[185]

---

[178]   Testimony of Clem Dalrymple.
[179]   Testimony of Clem Dalrymple.
[180]   Ducote Transcript at 57:14-19.
[181]   Ducote Transcript at 57:14-19.
[182]   Ducote Transcript at 48:3-4.
[183]   Ducote Transcript at 48:3-10.
[184]   Ducote Transcript at 48:9-10.
[185]   Ducote Transcript at 48:23-49:3.

In addition, Ducote considered data from the Bureau of Labor Statistics,[186] noting that the median wages for similar jobs fell between $9.09 to $12.28 per hour.[187]  Ducote opined that the Bureau's figures represented only "the median hourly wages for these *types* of jobs or similar types of jobs."[188]  Finding the distinction between actual wages and median wages critical, Ducote's ultimately concluded that Dalrymple's post-accident earning capacity was $8.00 to $10.00 per hour.[189]

The Government's vocational rehabilitation expert, Ian Hegwood, arrived at a different conclusion.  Hegwood found that Dalrymple was qualified for at least eleven different jobs, such as an "automobile part salesperson, automobile repair service estimator, material handling equipment sales representative, construction machinery sales representative, [or an] automobile service manager."[190]  Each of these jobs, Hegwood testified, ranged from $16.35 per hour to $31.59 per hour in wages.[191]  This represents an annual salary range between $34,008 and $65,707.

The Court finds that Ducote's methodology is more robust than Hegwood's.  Although both Hegwood and Ducote looked to the Bureau of Labor Statistics to find the median wages for the jobs in Dalrymple's labor market,[192] Hegwood did

---

186     Ducote Transcript at 49:19-24.
187     Ducote Transcript at 49:4-50:3.
188     Ducote Transcript at 49:19-50:3.
189     Ducote Transcript at 57:19 to 58:3.
190     Hegwood Transcript at 47:3-18.
191     Hegwood Transcript at 48:21-23.
192     Hegwood Transcript at 49:15 to 50:3.

not perform a labor market survey.  Ducote took the extra step of performing the labor market survey and contacted specific employers to discover actual wage amounts, which convinces the Court that Ducote's opinion better reflects Dalrymple's real-world prospects.  *Cf. Banks v. Indus. Roofing & Sheet* Metal *Works, Inc.*, 696 So. 2d 551, 557 (La. 1997) (noting that employers must demonstrate "an *actual* position available" in a person's "geographic region" to show job availability in worker's compensation cases).  Accordingly, the Court credits Ducote's testimony on Dalrymple's post-accident earning capacity.

Although Dalrymple believes he cannot return to work, Hegwood, the Government's vocational expert, and Bardarson, its FCE expert, testified that Dalrymple remains capable of earning wages.  Further, Dalrymple's vocational expert admitted that he had "not seen any medical documentation stating that [Dalrymple] has physical limitations that prevent him from working at all."[193] Hegwood confirmed that the medical records did not address any work restrictions for Dalrymple that would prevent him from earning wages.[194]   Bardarson concluded that Dalrymple could perform "light work."[195]  Additionally, LaFleur testified that as of their last post-operative meeting, on June 22, 2018,  if Dalrymple "did some physical therapy and worked up to the point where his back

---

193   Ducote Transcript at 59:9-14.
194   Hegwood Transcript at 35:1.
195   Bardarson Transcript at 49:18-23.

muscles were strong enough . . . I would think that he could go back to doing a job where he was able to lift 50 pounds."[196]

Taking all of this into account, the Court finds that Dalrymple's post-accident earning capacity is $20,800 per year.  When compared to Dalrymple's pre-accident earning capacity, $52,000 per year, there is a difference of $31,200 in annual earning capacity.  The Court measures this loss of earning capacity from the date of trial, February 3, 2021, to Dalrymple's expected date of retirement at age 65 (or 5.5 years).[197]  Putting these numbers together, the Court finds Dalrymple will lose $171,600 in future earning capacity.[198]

"Damage awards for future pecuniary losses in suits governed by federal law must be discounted to present value."  *Hollenbeck v. Oceaneering Intern., Inc.*, 685 So. 2d 163, 177 (La. App. 1 Cir. 1996) (collecting cases).  The parties have not stipulated to the appropriate discount rate.  The Court discounts $171,600 to present value, using a present value of an annuity calculation.[199]  The discounted

---

[196]   LaFleur Transcript at 48:6-14.

[197]   Silva Transcript at 40:19-25.  Dalrymple's birthday is September 2, 1961.  His 65th birthday is on September 2, 2026.

[198]   Apart from Dalrymple's expected retirement age, the Court notes that it does not otherwise credit plaintiff's expert witness, Craig Silva.  Silva's lost earning capacity estimate assumed that plaintiff was "permanently and totally disabled," meaning that Dalrymple is unable to work at all in his post-accident condition.  *See* Silva Transcript at 46:3.  No competent evidence supports such an assumption.  Because there was no foundation to support Silva's assumption that Dalrymple would never be able to work again, the Court does not credit his testimony.

[199]   The Court assumed an annual payment amount of $31,200 over 5.5 years.  For each year, the Court assumed a discount rate of 1.82%, the long-term average break-even rate for the U.S. Treasury's inflation-protected securities.  *See, e.g.*, *Iles v. Odgen*, 37 So. 3d 427, 437 (La. App. 4 Cir. 2010).

value is $161,958.13. Accordingly, the Court awards Dalrymple $161,958.13 in lost future earning capacity.

The above awards for lost past wages and lost earning capacity are premised on the finding that Dalrymple was earning wages at the time of the accident. At trial, the Government introduced evidence showing that Dalrymple applied for Social Security disability benefits on April 11, 2017[200] and represented that he had been disabled and unable to work since December 30, 2013[201]—three years *before* the accident. In his application for benefits, Dalrymple did not list any employment after December 2012.[202]

The import of this evidence, according to the Government, is that it undermines Dalrymple's claims for lost wages and earning capacity. If Dalrymple were disabled and unable to work as of December 30, 2013, as he represented to the Social Security Administration (SSA), this would preclude an award for lost wages and earning capacity because at the time of the accident, he would not have been earning wages, or capable of earning wages.[203] As noted above, the Court has credited plaintiff's testimony that he was working at a rate of $300-per-week at the time of the accident. There are no medical records indicating that plaintiff had a

---

[200]    Defendant's Exhibit 53.
[201]    Defense Exhibit 53, at SSA0007; SSA0022.
[202]    Defense Exhibit 53, at SSA0023.
[203]    The Government's economic expert, Jeffrey Meyers, testified that if Dalrymple was disabled and unable to work, he would not have been earning wages before the accident; nor would he have lost any earning capacity as a result of the accident. *See* Meyers Transcript at 39:4-10.

symptomatic back condition before the accident, or any other condition that foreclosed his ability to work.  Even after the accident, no medical expert has provided testimony consistent with the representations Dalrymple made to the SSA—that he "is unable to work because of [his] disabling condition."[204]

Further, the parties stipulated that, at the time of the accident, the motorcycle Dalrymple was driving was owned by someone else, Daniel Bordelon.[205]  Plaintiff testified that he spent the early part of January 15, 2017, installing a new set of Kevlar clutches on Bordelon's motorcycle.[206]  The Government did not contest any of that evidence at trial.  The parties' stipulation that the motorcycle belonged to Bordelon, and Dalrymple's unchallenged testimony that he had been working on the motorcycle earlier that day, also support the Court's finding that Dalrymple was capable of working as a mechanic at the time of the accident.

For whatever reason, Dalrymple made statements to the SSA in his April 17, 2017 application that conflicted with his trial testimony.  Dalrymple's efforts at trial to explain the conflicting statements in his SSA application were unworthy of belief.  On cross-examination, plaintiff could not explain why December 30, 2013 was listed as the onset date for his disability in his application, or why he listed no employment after 2012.  He testified that a friend from Texas filled out his

---

[204]    Defendant's Exhibit 53, at SSA0007.
[205]    Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.
[206]    Testimony of Clem Dalrymple.

application for disability for him because he was unfamiliar with computers.[207]  He testified that he sat beside his friend as she filled out the application and that he supplied her with the relevant information, including medical records.[208]  Yet he claimed that he did not read what she input and offered no explanation of why she would insert incorrect information.

At no point before the litigation did Dalrymple attempt to correct the disability onset date or employment information on his Social Security application despite having received a document entitled "Receipt for Your Claim for Social Security Disability Insurance Benefits."[209]  That document informed Dalrymple as follows:

> You declared under penalty of perjury that you examined all the information on this form[,] and it is true and correct to the best of your knowledge.  You were told that you could be liable under law for providing false information.[210]

But Dalrymple read the application at some point.  On September 28, 2017, he contacted the SSA to change the way his name appeared in various places on his application, but not to change any of the statements at issue here.[211]

Further, another form from the SSA entitled "Application Summary for Disability Insurance Benefits," indicates that someone from the SSA spoke with

---

[207]    Testimony of Clem Dalrymple.
[208]    Testimony of Clem Dalrymple.
[209]    Exhibit 53, at SSA0009.
[210]    Defense Exhibit 53, at SSA0009.
[211]    Defense Exhibit 53, SSA0018 (including Dalrymple's middle name, "Dewayne," as "worker's name" and "claimant's name," but using only the middle initial, "D," for "applicant's name"); *see also* Meyers Transcript at 43:15-18.

Dalrymple on April 11, 2017.  Specifically, the document provides: "[o]n April 11, 2017, *we* talked with *you* and completed *your* application for Social Security Benefits."[212]  The document also contains a summary of the statements Dalrymple made to the SSA, which include the following: "*My* name is Clem Dewayne Dalrymple . . . . *My* date of birth is September 2, 1961 . . . . *I* became unable to work because of my disabling condition on December 30, 2013."[213]  At trial, Dalrymple denied any recollection of speaking with someone from the SSA on April 11, 2017.[214]  The Court finds it implausible that the SSA would make such a conversation up.

The SSA determined that Dalrymple became disabled on September 1, 2016,[215] months before the accident.  "To qualify for disability benefits, you must be disabled for five full calendar months in a row."[216]  As a result, Dalrymple became entitled to benefits starting in February 2017.[217]  Had Dalrymple indicated in his application that he became disabled on January 15, 2017, as he testified was his intent, he would not have been entitled to benefits until June of 2017.

The Court finds Dalrymple's implausible testimony about his SSA application damaging to his credibility.  The Court has taken this into account in determining the weight to give Dalrymple's testimony.

---

[212]     Defense Exhibit 53, SSA0007 (emphases added).
[213]     Defense Exhibit 53, SSA0007 (emphases added).
[214]     Testimony of Clem Dalrymple.
[215]     Defense Exhibit 53, SSA0001.
[216]     Defense Exhibit 53, SSA0001.
[217]     Defense Exhibit 53, SSA0001.

### 3.   Past Medical Expenses[218]

The parties stipulate that plaintiff's medical bills related to the accident have been paid by Medicaid.[219]  Plaintiff does not seek to recover these expenses.[220]  In any event, plaintiff is not entitled to double recovery from the Government for past medical expenses defendant has already paid.  *See Brooks v. United States*, 337 U.S. 49, 54 (1949) ("[W]e now see no indication that Congress meant the United States to pay twice for the same injury . . . ."); *see also Smith v. United States*, No. 09-249, 2012 WL 3017704 (W.D. Pa. 2012) (noting that "numerous federal courts . . . have held that Medicaid is not a collateral source" for damages from the United States (collecting cases)).

The parties stipulate that there is a Medicaid lien in the amount of $58,082.97 on any settlement or judgment from this action.[221]  Medicaid is a federal program, administered by the states.  *Arkansas Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006).  "The program is a cooperative one," and states who participate in the program must comply with the applicable federal statutory requirements.  *Id.*  One of those federal requirements is that the state agency in charge of Medicaid must "take all reasonable measures to ascertain the

---

[218]   The parties stipulate that Dalrymple is not seeking any damages for future medical expenses.  Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.

[219]   Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.

[220]   R. Doc. 221 at 52-53.

[221]   Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.

legal liability of third parties" and to ensure that those entities "pay for care and services available under the plan."  42 U.S.C. § 1396a(a)(25)(A).

Louisiana law provides that the Louisiana Department of Health "shall have a privilege for the medical assistance payments made by the department or Medicaid managed care organization on behalf of an injured or ill Medicaid recipient on the amount payable to the injured recipient . . . to be collected, whether by judgment, settlement or compromise."  La. Rev. Stat. 46:446.  "In general, this means that Medicaid gets reimbursed before the tort victim takes ownership of the proceeds of his or her claim."  *Duplechain v. Jalili*, 52 So. 3d 1072, 1076 (La. App. 3 Cir. 2010).

Courts have awarded the amount of a Medicaid lien as a damage award for past medical expenses in cases where the United States is the defendant.  *See, e.g.*, *Bravo v. United States*, 403 F. Supp. 2d 1182, 1200 n.13 (S.D. Fla. 2005) ("[O]nly the amount of the Medicaid lien for past payments is recoverable against Defendant United States of America."); *see also Morris v. United States*, No. 13-2246, 2018 WL 3650442, at *1 (W.D. La. July 16, 2018) (recommending that "plaintiff is entitled to recover the full amount of the Medicaid lien as medical expense damages"), *report and recommendation adopted*, No. 13-2246, 2018 WL 3637931 (W.D. La. July 31, 2018).  The Court awards Dalrymple $58,082.97 to satisfy the Medicaid lien for his past medical expenses.  *See Tamayo v. American Nat. Gen. Ins.*, 150 So. 3d 459, 470 (La. App. 5 Cir. 2014) ("A plaintiff may recover

past medical expenses that he incurs as a result of an injury due to the fault of another.").

### 4. General Damages

Dalrymple seeks a general damages award.   General damages "include mental or physical pain and suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in monetary terms." *Prejeant v. Gray Ins.*, 176 So. 3d 704, 710 (La. App. 5 Cir. 2015).  General damages are "inherently speculative in nature and cannot be fixed with mathematical certainty." *Bouquet v. Wal-Mart Stores, Inc.*, 979 So. 2d 456, 458 (La. 2008) (collecting cases).  "There is no mechanical rule for determining general damages; the facts and circumstances of each case control." *Koehn v. Rhodes*, 992 So. 2d 757, 762 (La. App. 2 Cir. 2004).  "The discretion vested in the trier of fact is 'great,' even vast, so that an appellate court should rarely disturb an award of general damages." *Lohenis v. Roussee*, 166 So. 3d 1020, 1025 (La. App. 1 Cir. 2015).

### a. Pain and Suffering

"Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury." *Locke v. Young*, 973 So. 2d 831, 846 (La. App. 2 Cir. 2007).  The Court finds that Dalrymple suffered substantial pain and suffering for which he is entitled to damages.

46

The medical records and evidence indicate that Dalrymple's treatment, including surgeries, medication, and various forms of therapy, continued for well over a year after the accident.  Dalrymple undoubtedly suffered considerable pain, discomfort, and inconvenience from his injuries and as a consequence of undergoing the six surgeries he had over a thirteen-month period.  Janet Morse, Dr. Kinnett's nurse practitioner, testified that it is "not uncommon after any kind of surgery to have pain, extensive pain."[222]  Dalrymple was on narcotic pain medication from January 15, 2017 to February 9, 2017—the day of the accident through his stay at North Oaks Rehabilitation hospital.[223]  Even with that medication, on February 8, 2017, Dalrymple reported that "[t]he pain [was] unbearable" to his healthcare providers at North Oaks Rehabilitation Hospital.[224]  He was prescribed narcotic pain medication on March 20, 2017,[225] and again on April 17, 2017.[226]  Dalrymple reported "9/10" pain in his wrists to health care providers at North Oaks Rehabilitation Hospital on May 10, 2017.[227]  His intractable pain was also the reason for his 2018 back surgery.  The operative note for the February 26, 2018 wrist procedure indicated that one of the reasons for the operation was the "persistent pain" Dalrymple continued to experience in his left

---

[222]    Morse Transcript at 31:4-10.
[223]    Plaintiff's Exhibit 12 at Page 2616.
[224]    Plaintiff's Exhibit 12 at Page 2647.
[225]    Plaintiff's Exhibit 14 at 96.
[226]    Plaintiff's Exhibit 14 at 116.
[227]    Plaintiff's Exhibit 13 at 1168.

wrist more than a year after the accident.[228]  On June 22, 2018, LaFleur noted that Dalrymple had "outstanding sacroiliac pain that really never was addressed."[229]

Dalrymple also underwent extensive physical therapy for his injuries.  At North Oaks Rehabilitation Hospital, Dalrymple underwent physical therapy,[230] occupational therapy,[231] as well as speech therapy.[232] At trial, Dalrymple indicated that he was in speech therapy for "a couple months" after the accident.[233] Beginning in June 2017, Dalrymple underwent physical therapy for his back.[234] LaFleur continued to recommend physical therapy for Dalrymple's back even following the surgery in January of 2018.[235]  Although LaFleur could not remember the exact time for Dalrymple, he also opined that Dalrymple would have been in a brace "anywhere from six weeks to three months."[236]  For the foregoing reasons, Dalrymple is entitled to damages for pain and suffering.

        b.    *Loss of Enjoyment of Life*

The Court also finds that Dalrymple has suffered loss of enjoyment of life. "Loss of enjoyment of life is conceptually distinct from other components of

---

[228]    Plaintiff's Exhibit 17 at 5299.
[229]    LaFleur Transcript at 48:6-14.
[230]    Plaintiff's Exhibit 12 at Page 2616.
[231]    Plaintiff's Exhibit 12 at Page 2616.
[232]    Plaintiff's Exhibit 12 at Page 2636; *see also* Testimony of Clem Dalrymple (testifying that he had speech therapy "for a couple months following the accident").
[233]    Testimony of Clem Dalrymple.
[234]    LaFleur Transcript at 18:14 to 19:20.
[235]    LaFleur Transcript at 60:5-8.
[236]    LaFleur Transcript at 44:5-11.

general damages, including pain and suffering." *Locke*, 973 So. 2d at 846. "Loss of enjoyment of life . . . refers to detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury." *Id.*

At trial, plaintiff testified that all of the work he has done in his adult life has been as a mechanic.[237]  All experts who opined on the issue found that Dalrymple was unable to return to work as a mechanic.  The Court finds that Dalrymple has suffered loss of enjoyment of life from his inability to continue to work in his chosen field.[238]

Dalrymple also suffers loss of enjoyment of life from the lasting physical limitations that were caused by the accident.  Dalrymple no longer has the ability to bend his left wrist.[239]  Trevor Bardarson, the Government's physical therapist, testified that, at maximum medical improvement, Dalrymple "had about a 50 percent limitation into forward bending, a 60 percent into backward bending, and his bending to the sides was about 60 percent."[240]

Plaintiff testified that his physical limitations rendered him unable to maintain some of his hobbies.  For example, Dalrymple testified that he was "an avid [scuba] diver" but that he can no longer scuba dive.  Plaintiff testified that

---

237     Testimony of Clem Dalrymple.
238     Testimony of Clem Dalrymple.
239     Testimony of Clem Dalrymple.
240     Bardarson Transcript at 44:10-17.

"just picking up the tanks is enough," meaning that he is unable to handle the weight of the oxygen tanks.[241]

Taking into account all of Dalrymple's pain and suffering, as well as his loss of enjoyment of life,  the Court awards Dalrymple $1,050,000 in general damages.

The Court finds that although plaintiff asked for $2,000,000 more in general damages,[242] this amount is not warranted.  Although Dalrymple sustained several serious injuries that required surgery, many of Dalrymple's injuries resolved on their own.  For example, Dr. Peltier testified that although he had to realign Dalrymple's nose the morning after the accident, "[t]he other fractures that he had, the frontal sinus fracture, the orbital fractures . . . appeared like they would heal without any kind of long-term problems."[243]  Peltier also testified that he thought Dalrymple's double vision "was probably something that could be left alone that would maybe resolve over time."[244]

Although Dalrymple testified at trial that his pain was currently at a "10" on a scale of 1-10, and that he would be in such pain for the rest of his life,[245] the Court finds this testimony exaggerated.  Dalrymple did not appear to be in acute pain when he testified at trial.  He testified that he no longer takes any pain medication,[246] that he has not "had to go back to see any of the doctors," and that

---

[241]   Testimony of Clem Dalrymple.
[242]   R. Doc. 221 at 53.
[243]   Peltier Transcript at 11:1-6.
[244]   Peltier Transcript at 15:16-18.
[245]   Testimony of Clem Dalrymple.
[246]   Testimony of Clem Dalrymple.

he does not have any future surgeries planned.[247]  He was not on pain medication in 2020.  Further, there is no medical testimony that suggests Dalrymple will suffer constant, intense pain for the rest of his life.   In addition, there are no medical records reflecting complaints of pain or prescriptions for pain medication after 2018.

Dalrymple further claims pain and suffering for injuries unrelated to the accident.  For example, Dalrymple testified that his stomach problems "have been bad for the past few years,"[248] and he seeks damages for "[i]ntractable vomiting."[249]  But the parties stipulated that Dalrymple had presented to the emergency room before the accident "on 10 separate occasions," starting in 2014, for his gastritis and GERD issues.[250]  The Court has found no evidence that his stomach problems were caused by, or worsened as a result of, the accident.  Similarly, Dalrymple indicated that he suffered Erectile Dysfunction as a result of the accident.[251]  The Court has found no evidence that shows this condition was caused by the accident.  And while Dalrymple testified that the accident caused him to limp,[252] Bardarson found it "bizarre" that Dalrymple was limping because

---

[247]    Testimony of Clem Dalrymple.  The parties also stipulate that plaintiff is not seeking damages for future medical costs.  Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.
[248]    Testimony of Clem Dalrymple.
[249]    R. Doc. 221 at 17.
[250]    Joint Stipulations, Read into the Record During the Testimony of Clem Dalrymple.
[251]    Testimony of Clem Dalrymple; R. Doc. 226 at 6.
[252]    Testimony of Clem Dalrymple.

"his strength was normal, and his motion was normal."[253]  Bardarson could not "correlate why he had that kind of bizarre gait."[254]

In light of all of these considerations, the Court finds that plaintiff's proposed general damages award excessive, and that $1,050,000 adequately compensates Dalrymple for his pain and suffering and loss of enjoyment of life.

## IV.   CONCLUSION

For the foregoing reasons, the Court finds the United States of America liable to Clem Dalrymple for the injuries he suffered because of its fault and that it must pay Dalrymple damages in the amount of $46,500 in lost past wages, $161,598.13 in lost future wages/earning capacity, $58,082.97 for past medical costs, and $1,050,000 in general damages, for a total of $1,316,181.10.

New Orleans, Louisiana, this __11th__ day of March, 2021.

*Sarah Vance*

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[253]   Bardarson Transcript at 48:8-12.
[254]   Bardarson Transcript at 48:11-12.